IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| VALDEZ LAMONT JORDAN,<br>　　　Plaintiff, | ) |
| | ) |
| | ) |
| 　　　v. | ) Case No. 25-39-DWD |
| | ) |
| BIANCA COSTANTINO, KEVIN JOHNSON,<br>SHANAE GILLENWATER, and JOHN DOE, sued in<br>their individual capacities.<br>　　　Defendants. | ) |
| | ) JURY TRIAL DEMANDED |
| | ) |

COMPLAINT FOR MONEY DAMAGES

1.　This is a civil rights action filed by Valdez Lamont Jordan, a state prisoner, for money damages for abridging my freedom of speech and depriving me of due process of law.

## I.　JURISDICTION AND VENUE

2.　This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).

3.　Venue is proper in this District under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this judicial district.

## II.　INTRODUCTION

4.　In the summer of 2021 I began communicating with David Adams, a Journalist and crime blogger, and Ted Pearson, co-chairperson, emeritus, for Chicago Alliance Against Racist and Political Repression, a movement that publicize wrongful convictions and fight for a system of restorative justice.

5.　In October 2021 Mr. Adams posted an article and petition on Change.org, and in November 2021 Mr. Pearson printed an article in the Alton Telegraph. Each article and petition was created to bring awareness, and to get the Illinois Attorney General to conduct an investigation relating to corruption by certain Madison County, Illinois State officials regarding prosecution of several men wrongfully convicted including myself.

1

6. Using typing paper purchased from the prisoner's commissary, I typed the same message five hundred times which stated, "Go to Change.org type in Valdez Jordan & sign petition with the 4 pictures & share it." From October 2021 up to March 2022 I passed out the papers to prisoners and staff, asking them to have their loved ones go online to support the petition.

7. One of the papers was found in another prisoner's cell, tested with a field test, resulting in presumptive positive for synthetic cannabinoids. I was put in Restrictive Housing, Internal Affairs, (IA), then searched the cell I occupied, removed 175 pieces of the same papers which also tested presumptive positive for synthetic cannabinoids. The IA conducted an investigation and thereafter determined I conspired and attempted to introduce synthetic cannabinoids into Lawrence Correctional Center even though the evidence indicated I committed no such offenses.

8. The IA used and the Adjustment Committee relied on fake drug tests to interfer with my right to free speech and punished me without due process. The test used by IA is believed to be, the NARK 20023, which porports to be able to detect synthetic cannabinoids. When used to test for drugs sprayed on paper, however, the NARK 20023 is not accurate. It is believed interaction with innocuous chemicals commonly found in paper frequently create false positives at an alarmingly high rate.

9. Once the presumptive positive was generated, the IA and AC refused to send the papers to an laboratory for confirmatory testing. The IA's and AC's arbitrarily punishing me based on test results it knew or should have known were unreliable was unnecessary and served no legitimate penological interest. By sending the papers out for confirmatory testing my punishment could have been avoided. And had the test came back positive I would not been able to escape liability since I was already

2

under the Defendants' control.

10. I was subjected to solitary confinement, loss of right to properly practice my religion and eat nutritionally adequate diets, which result in significant weight loss and bodily harm, loss of work assignment, loss of opportunity to have several days of Earned Program Sentence Credits documented and added to my master record. based on false positive tests generated by the IA's use of, and AC's reliance on the NARK 20023.

11. I was falsely accused and punished by the IA and AC based on their faulty tests. I bring this case on behalf of myself to redress Defendants' unconstitutional and illegal conduct.

### III.   PARTIES

10. Plaintiff, Valdez Lamont Jordan is incarcerated at Pinckneyville an Illinois Department Of Corrections facility, 5835 State Route 154, Pinckneyville, IL. 62274. The IDOC Number is: B29482. At all times during the events giving rise to this action I was incarcerated at Lawrence.

13. Defendant #1 Bianca Costantino is employed as a Internal Affairs Correctional Officer by the Illinois Department Of Correction: 1301 Concordia Court, Springfield, IL 62794-9277.

14. Defendant # 2 John /Doe  is employed as a Hearing Investigator/ Reviewing  Officer by the Illinois Department Of Corrections: 1301 Concordia Court, Springfield, IL. 62794-9277.

15. Defendant #3 Kevin Johnson is employed as a Adjustment Committee Lieutenant by the Illinois Department Of Corrections: 1301 Concordia Court, Springfield, IL. 62794-9277.

16. Defendant #4 Shanae Gillenwater is employed as a Adjustment Committee Correctional Officer by the Illinois Department Of Correctionas: 1301 Concordia Court, Springfield, IL. 62794-9277.

3.

IV.    PREVIOUS LAWSUITS & LITIGATION HISTORY

17.  At this time, I currently have four § 1983 Civil suits pending in the
     SDIL:

18.  Valdez Lamont Jordan v. John Barkwick et al., No. 24-cv-2125-SMY: Judge
     Staci M. Yandle; Valdez Lamont Jordan v. David Mitchell et al., No. 23-
     cv-3086-DWD: Judge David W. Dugan; Valdez Lamont Jordan v. Deanna
     Brookhart et al., No. 23-cv-2654-RJD: Judge Reona J. Daly; and Valdez
     Lamont Jordan v. Melissa Wise & Carissa Luking, No. 22-cv-3041-MAB:
     Judge Mark A. Beatty.

19.  I currently have a petition for Writ for Habeas Corpus pending in the
     SDIL: Valdez Lamont Jordan v. David Mitchell, No. 22-cv-286-SMY: Judge
     Staci M. Yandle.

20.  I previously filed a Petition for Writ for Habeas Corpus: Valdez Jordan
     v. Nicholas Lamb, No. 16-cv-1297: Judge David R. Herndon: SDIL, filed
     December 1, 2016: Dismissed without prejudice for failure to exhaust
     state court remedies on May 23, 2017.

21.  No, the case was not dismissed as being frivolous, malicious, or failure
     to state a claim upon which relief may be granted, and No, I did not
     receive a strike.

V.    GRIEVANCE

22.  Yes, there is a grievance procedure, and Yes, the facts relating to this
     complaint was presented in the grievance. Three seperate grievances
     were submitted regarding this issue.

4

23. The steps taken to exhaust first grievance #05-22-057 is that: On April 26, 2022 I submitted grievance raising the matter stated in this complaint to Grievance Officer McFarland. On August 5, 2022 he presented a response recommending grievance be denied. On August 9, 2022 the Warden concurred with the recommedation. On August 21, 2022 I appealled to the Administative Review Board, and I never received a response from the ARB.

24. On May 24, 2022 I submitted second grievance # 05-22-268 raising the matter stated in this complaint to Grievance Officer McFarland. On August 5, 2022 he presented a response recommending that my issue be duplicate to grievance #05-22-057, and will not be furthered reviewed. On August 8, 2022 the Warden concurred. On August 21, 2022 I appealled to the ARB, and on December 15, 2022 the ARB denied the grievance.

25. On June 23, 2022 I submitted third grievance #07-22-031 raising the matter stated in this complaint to Grievance Officer McFarland. On August 18, 2022 he presented a response recommending that my issue be duplicate to grievance #07-22-031. On August 23, 2022 the Warden concurred. On August 30, 2022 I appealled to the ARB, and I never received a response from the ARB.

## VI.   FACTUAL ALLEGATIONS

26. On 3-5-2022 I was outside the cell working my job assignment as an ADA Specialist when a Lieutenant came and asked me to turn around and cuff up. I complied and was walked the the Restrictive Housing Unit, (RHU), where I was stripped searched and place in a cell. I asked the Lieutentant why I was walked to RHU and he responded he did not know.

27. On 3-7-2022 I was served a Disciplinary Report, (DR), marked Investigative, written by Bianca Costantino, (Costantino), dated

3-5-2022 for Offense: DR 504: Investigative Status, Observation stating:
Individual in Custody VALDEZ JORDAN B29482, is being placed in Restrictive
Housing under Investigative Status pending the outcome of an Investigation.
Upon completition of the investigation, it shall be determined if JORDAN
is to be cited under DR 504. (Exhibit A).

28.   On 3-7-2022 I put a request in the institutional mail addressed to the
Reviewing Officer, requesting an interview pursuant to DR section 504.50
c)1)2)4), and DOC 0317 form, which states, Procedures Applicable to all
Hearings on Investigative and Disciplinary Reports -- You have the right to
appear and present a written or oral statement or explaination concerning
the charges. You may present relevant physical material such as records
or documents. (Exhibit A).

29.   I explained in the request to the Reviewing Officer that the Investigative
Report written on 3-5-2022 by Costantino violated DR section 504.30d)
which states in pertinent part, an investigative report, shall be issued
that reasonably informs the offender of the subject of the investigation
to the extent that safety and security allow.  That I need to be informed
of the subject of the investigation so I could present my views regarding
placement in investigative status. However, the Reviewing Officer never
interviewed me  or informed me of the subject of the investigation. (Exhibit B).

30.   On or about 3-20-2022 Costantino called me out the cell for an interview.
She asked me if I knew why I was in RHU. I said no. She stated, you don't
know why you are here. I said, I know I've done nothing that warrant me
being put in RHU under investigation.

31.   Costantino then asked me what is Change.org. I told her it is a website
where anyone can put petition on, and support petitions posted.

32.   Costantino began to ask another question then stopped and told me before

we go further she has to read my rights which she then did, and asked if I understood them.

33. I asked if I was being charged with a criminal offense. Costantino stated no. I asked will the statement I give be used against me in a criminal offense. Costantino stated, look I know you think you know the law but I don't have time to be going back and forth with you.

34. I told Costantino, I'm just trying to get a full understanding of what is taking place, that I'm in prison because the police falsified a case against me, so if I'm being charged with something when I know I've done nothing wrong, then I must protect myself to the fullest extent that the law allows. I then asked again will my statements be used in a criminal investigation. Costantino stated, yes.

35. I told Constantino, I assert my right to remain silent, and I assert my right to counsel, and I would like counsel to speak for me during this interview.

36. Costantino stated, you know full well I do not have a lawyer here right now so we have to end this interview. I said, alright.

37. Costantino then told me, you know I can give you a ticket for impeding an investigation.

38. I told Costantino, if she write me a ticket for impeding an investigation she would be falsifying an official report because I'm not impeding an investigation, if this is a criminal investigation then I have the right to remain silent.

39. Costantino stated, she's not talking about a criminal investigation, she is talking about an internal investigation.

40. I told Costantino, I'm not impeding an internal investigation, my words will be used against me in a criminal case, I have no problem talking

7

but it would be through a lawyer.

41. Costantino, then stated, well I'm not talking about a criminal investigation.

42. I then stated, so are you saying now if I talk to you my words will not be used in a criminal investigation. Costantino stated, no. I stated, so we are clear, I assert my right to remain silent and right to counsel for any criminal investigation, and I do not and will not waive these rights. Costantino stated, alright this is not a criminal investigation it is an internal investigation. I then asked, what do she want to know.

43. Costantino then asked, who put my petitions on Change.org. I told her, I do not remember who posted the first two, and that David Adams posted the third. Costantino asked, who is David Adams, how did I meet him, where did he live. I stated, he's a journalist, a friend of mine contacted me through email telling me he wanted to interview me about the case I'm in prison for. I do not know where he live.

44. Costantino asked, how often did David Adams and I talk. I told her, we conducted alot of interviews in the beginning almost every day for the first few months, but now we talk about once a week.

45. Costantino asked, what was my petitions about. I told her, one is about getting support to bring parole to Illinois, and the other two are about getting support for my freedom regarding the case I'm in prison for.

46. I then told Costantino, if she go to Change.org type in my full name, the three petitions will pop up. I then ask if she know who packed my personal property from the cell I was in before being placed in RHU. She said, she was present when the cell I was in was searched.

47. I stated, that if she was present then she sould have seen a small stack of papers on the top bunk when you first walk in the cell. I told her,

8

each paper state go to Change.org type in Valdez Jordan and sign petition with four pictures and share it. I told her, I'd been passing the papers out to prisoners and staff asking them to have their loved ones go online to support the petition. That the petition is about getting the Attorney General to conduct an investigation in regards to corruption relating to my case and others. That I have a copy of the petition and article in the cell.

48.  I told  Costantino, that I have an evidentiary hearing scheduled at court on April 12, 2022 where I finally get the opportunity to present the proof of my wrongful conviction. And that I was also using the petition to build support for a rally outside the court on April 12.

49.  Costantino told me, she found the stack of paper and asked where did I get the paper from. I stated, I purchased it from the commissary. She asked how did the paper come packaged. I stated, in a clear plastic seal. She asked, when was the last time I purchased paper from the commissary. I stated, I don't know the exact date but within the last five weeks or so.

50.  Costantino asked, if I get a lot of mail. I stated, yes, but most of it is either internal, privilege, or legal mail.  She then asked my where do my wife and daughters live. I told her East Alton. She asked, if I have alot of family who live in Illinois. I stated yes.

51.  Costantino stated that the interview was done, she got up to retrieve a copy of what she typed up, show me that it was marked internal investigation and not criminal, allowed me to read the statement, asked me to sign it, which I declined.

52.  I stated to Costantino, the petitions on change.org cannot be the reason I'm under investigation, the petitions are legal, I'm violating no laws, or rules, and I have a right to freedom of speech.  Costantino chuckled and stated, the interview was over.

9

53.    I stated to Costantino, you cannot be serious, I'm cooperating with you trying to figure out why I'm in RHU. I got the most important day of my life coming up April 12th, so that's where all my focus and prepartion has been on. That whatever this investigation is about it is interferring with my life and causing a major set back in preparing for my case. That this investigation cannot be about the petitions on Change.org, and if it is than I cannot be punished for protected speech.

54.    Costantino threw the papers she was holding on the desk, and stated, alright lets talk about what this is about. She then asked, if there is a problem at Lawrence with inmates cheeking. I told her, I never heard that term before. She stated, cheeking is when someone hide there medication in their mouth during med-line and spit it out after med-line. I stated, hell yes there is a problem with cheeking but you already know that.

55.    Costantino that asked, what do I know about synthetic cannabinoids. I stated, nothing but what I have seen on news channels, and that I did not not know much about it until being back in RHU right now and hearing prisoners talking about it. She then asked, if I ever smelled smoke since being in RHU. I stated, yes. She asked, if I ever smelled smoke in the housing units. I stated, I smelled smoke in every housing unit I've been in. She asked, if I ever seen inmates smoking anything. I stated, no.

56.    Costantino asked, if I ever seen inmates passing synthetic cannabinoids. I stated, no. She asked, if I ever seen inmates doing any drugs. I stated, I've seen inmates snorting stuff in the dayroom. She asked, if I've ever heard inmates talking about drugs. I stated yes, when I'm in the cell I cannot help but hear them talking about it because I have Attention Deficient Disorder so I cannot help but hear the idiots talking about it.  She asked, what type of drugs do they talk about. I stated, Rinrons, nanas, a bunch of other names they call them.

10

57. I interview ended, Costantino retrieved the statement she just typed. I read and confirmed everythin in it. Before leaving I told Costantino, that their drug problem at Lawrence has nothing to do with me, I mind my own business, which is my freedom and my focus. That I come out the cell do my job assignment, used the phone, and the remaining time I'm working on my case to go home.

58. On 3-28-2022 I was served a DR written by Costantino on 3-27-2022 for the offense DR 504:601-Aiding Abetting Soliciting Conspiracy, and 203-Drug- Drug Paraphenlia. The DR states in pertinent part, On 03/05/2022 JORDAN was placed under Investigative Status. During the course of the Investigation, the Internal Affairs Unit monitored phone calls, Video Visits, GTL messages, performed searches, and conducted interviews;

59. On 3/5/2022, the Investigations Unit conducted a search for an ongoing investigation. The Investigations Unit confiscated several contraband items from the property box an individual who will remain anonymous for the safety and security of the individual and the safety and security of Lawrence Correctional Center. During the search, the Investigations Unit discovered one strip of paper, the exact description of the paper is being withheld due the safety and security of the institution: however, the strip of paper contained VALDEZ JORDAN's name;

60. The Investigations Unit conducted a field test on the strip of paper (actual name of Field Test being withheld for Safety and Security of the Institution), for synthetic cannabinoids. The Field test resulted in a presumptive positive result;

61. On 3/5/2022, the Investigations Unit conducted a search of JORDAN's property and discovered 175 pieces of the same paper that contained JORDAN's name. The Investigations Unit conducted a field test on the

11

strips of paper (actual name of Field Test being withheld for Safety and Security of the Institution), for synthetic cannabinoids. The field test resulted in a presumptive positive result; :

62. Upon the conclusion of the Investigation, it has been determined that VALDEZ JORDAN conspired and attempted to introduce synthetic cannabinoids into Lawrence Correctional Center. VALDEZ JORDAN B29482 is in violation of DR 504: 601 -Aiding and Abetting, Solicitation, or Conspiracy/203- Drug and Drug Paraphenalia. (Exhibit C).

63. On 3-28-2022 upon being served the DR I wrote on the face of the DR in the section stating, I am requesting that the Adjustment Committee or Program Unit consider calling the following witnesses regarding the Disciplinary Report of the above date: Interview inmates May upper 3, 5 house, Williams 5/A, and Law library worker Schofner, Shewmake, I request a outside Toxicology test. I request the website change.org with my name be looked up. I signed my name reserving all rights. (Exhibit C)

64 On 3-29-2022 I sent a request to the Hearing Reviewing Officer, (HRO), pursuant to section DR 504.60(a)1-5, requesting that the HRO review the strips of paper to confirm each states go to change.org type in Valdez Jordan sign petition with the 4 pictures and share it; I request the HRO to go online to Change.org type in my name to confirm the three petitions referring to me; I requested he interview Internal Affairs Lt. Pluckett to confirm in August 2020 Pluckett investigated and wrote me a DR for posting similar papers pertaining to the change.org petition;

65. I requested the HRO to interview Lt. Hough to confirm in 2020 he seen and read the papers I posted regarding the change.org petitions and we spoke about it afterward. I requested that he interview inmates Jamie Westray, Cleodous Schofner, Christopher Colemen, Tyvoenne Brown, Lester May, Jason Shewmake, and Dimond Barnes to confirm I gave them the

12

strip of paper asking them to have their loved ones go online and support the petition on Change.org. I requested the HRO to interview staff members Lt Hough, Sgt. Purdue, Sgt. J. Perkins, C.O. Slunaker, C.O. Hudley, C.O. Ztwing, C.O. Holtz, and Counselor Fitzgerald to confirm my character, work ethics, my focus on my freedom, and I requested he interview Ms. Schezer who taugh a college course to confirm I passed out the stipes of papers to all class member and gave her a copy as well.

66.  I handed the request for the HRO to Sgt. Cales asking that he place it in the Adjustment Committee witness box. Sgt. Cales told me that the HRO is in the building up front so he would give the request straight to him. Later that date on 3-29-2022 Sgt. Cales confimed that he did give the request to the HRO.

67.  On 4/5/2022 I went to the Adjustment Committee, (AC), where Lt. Kevin Johnson, (Johnson), and C.O. Shanae Gillenwater, (Gillenwater), were the AC hearing staff.  Upon entering the room I asked Johnson did the Hearing investigator submit any evidence or information regarding the investigation I asked him to conduct to help prove my innocence. Johnson stated, no;

68.  I handed Johnson a copy of the written request I sent to the HRO. I explained to Johnson that on March 29, 2022 Sgt. Cales confimed to me that he gave my request straight to the HRO. Johnson read the copy of the HRO request, then asked how do I plead. I then read my entire written statement for the AC word for word and handed it to Johnson, requesting that it be attached to the final summary;

69.  My written statement to the AC states in pertinent part, that I am innocent of the charges, that the information written in the DR do not

13

support the charges, the anonymous person makes no mention of me aiding and abetting, soliciting, conspiring, giving, or receiving and synthetic cannabinoids, the mentioned phone calls, video visits, GTL messages, performed searches, and conducted interviews makes no mention of me aiding and abetting, soliciting, conspiring, giving, or receiving any synthetic cannabinoids;

70. That with the facts mentioned above being the case, there is no evidence or proof of me conspiring which is defined as agreement between two or more people to commit an unlawful act, nor eveidence or proof of aiding and abetting, or soliciting. Therefore the 601 offense should be expunged;

71. That regarding the 203 Drug offense, setting aside the presumptive positive test result which equates to inconclusive, which means, of evidence not leading to a conclusion or definite result. Nothing in the DR states the paper with my name on it has anything to do with synthetic cannabinoids;

72. That, in support of turning the presumptive positive into a presumptive nagative and convincing you with proof that the 175 strips of paper is just ordinary paper I typed up to give people in support of my freedom champaign I state the following:

73. That, Change.org is an online website, if you go to Change.org type in my name three petition will show up involving me. I have been passing out the papers with my name on them asking people to have their loved ones go to Change.org to support the petitions. In August 2020 I received a DR for posting similar papers which I plead guilty to.  To review paper copies of the same petition, newspaper articles, and letters pertaining to the petition, make copies and attached them as evidence;

74. That, if you do not believe any of this then have all 175 strips sent to the Illinois State Police for testing. (Exhibit D).

14

75.  I handed Johnson a copy of the petition, newspaper article, and letter referred to in paragraph 73.  Johnson reviewed the documents, showed them to Gillenwater, and both confimed that the documents were about my case and Change.org.  (Exhibit E).

76.  Gillenwater then confirmed that she remembered when I heard the 2020 DR and plead guilty for posting the papers :

77.  Johnson handed the petition, article, and letter back to me, Gillenwater kept the HRO's request and the AC written statement, and Johnson told me they will look into everything, that he is going to copy both statements and send them back to me.

78.  In mid May 2022 I receive a copy of the Adjustment Committee Final Summary Report which final result was guilty of 601 Attempt/203 Drugs & Drug Paraphernalia, synthetic cannabinoids.  The basis for decision states exactly what is written on the 3-5-2022 DR with the exception that it states The field tested resulted in a positive result, and Based on a follow up with Internal Affairs to review the photographs of test results and contraband. Based on a DOC 0300 Shakedown slip completed. (Exhibit F).

79.  The Adjustment Committee Final Summary Report states no witness Requested.

80.  The AC's disciplinary actions against me were three months segregation, fourty five days commissary restriction, and six months contact visits restriction.

81.  Johnson and Gillenwater falsified the Final Summary Report by stating that I requested no witnesses, they falsified the Final Summary by stating the field test resulted in a positive result, and Johnson falsified his response to my grievance by stating my witnesses were not called as they were not properly identified.

82.  On information and belief  Costantino used faulty presumtive drug tests on papers tested March 5, 2022.

15

83.    On information and belief the test used by Costantino is the NARK 20023 made by Sirchie Acquisition, LCC (Sirchie). Sirchie markets this test as able to presumptively detect eight types of synthetic cannabinoids. "Synthetic cannabinoids" is a catch-all term used to refer to hundreds of human-made chemicals designed to simulate tetrahydrocannabinol, the primary active ingredient in marijuana. Synthetic cannabinoids can be sprayed onto plant matter or paper, which can then be smoked.

84.    On information and belief the NARK 20023 cannot reliably identify synthetic cannabinoids.

85.    On information and belief the NARK 20023 yields false positive at rates so high that its results are worse than random. That Sirchie ackowledged these issues before it began selling its NARK 20023 tests. In October of 2012, Sirchie issed a "NARK News" brochure acknowledging that the unique features of synthetic cannabinoids "make[] it almost impossible" to develope a "field test that will not have too many unacceptable false positives." Although none of the "unique features" that make a reliable test for synthetic cannabinoids "nearly impossible" have changed, Sirchie was manufacturing and marketing its NARK 20023 test by 2013.

86.    On information and belief IDOC employees are aware that the NARK 20023 generates a high rate of false positives.  I have provided IDOC employees information of the NARK 20023 false positive results through grievances, and other prisoners have informed IDOC employees through their letters to wardens, Johnson and Gillenwater, Costantino and the Internal Affairs Units, and through their grievances.

87.    On information and belief in addition to yeilding an unacceptably high rate of false positive results, the NARK 20023 is also broadly under-inclusive: it cannot identify most synthetic cannabinoids in circulation today, including those most commonly identified in the IDOC.

16

88. On information and belief the NARK 20023 is capable of identifying only eight specific synthetic cannabinoid formulas—out of the hundreds of synthetic cannabinoid formulas in circulation. These eight formulas have been the same since at least 2013.

89. On information and belief according to data collected by the National Forensic Laboratory Information System (NFLIS), most synthetic cannabinoids found in the market would not be detected by the NARK 20023—even assuming it worked as advertised. According to NFLIS's data, the specific formulas the NARK 20023 purports to identify are now outdated.

90. Johnson and Gillenwater imposed punishment based on the results of tests they knew or should have kwon were unreliable.

91. On information and belief despite the fact that the NARK 20023 is unreliable and unsuitable to the meaningful identification of synthetic cannabinoids, Lawrence Correctional Center staff used the NARK 20023 throughout its facility. Amoung other things, staff used the NARK 20023 on commissary bought typing paper, incoming legal mail, and other papers.

92. On information and belief when the NARK 20023 tests return presumtive results—as they often did, regardless of whether drugs were present on the papers— Costantino and the Internal affairs Unit refused to send the papers to a laboratory for confirmation testing, and imposed immediate punishment on myself and others.

93. Costatino's, Johnson's, and Gillenwater's imposition of any punishment on myself in reliance on the NARK 20023 is a violation of the fundamental rights guaranteed by the Federal Constitution.

94. Moreover, Costantino's, Johnson's, and Gillenwater's reliance on those tests furthered no legitimate goal or policy of Lawrence Correctional Center. Even assuming that wrongdoers possess synthetic cannabinoids at Lawrence,

the NARK 20023 cannot reliably identify the drugs for which it purports to test—resulting in an (assumed) inflow of drugs that was unimpeded by the Facility's use of the NARK 20023.

95.   Costantino's reliance on the Field test violated my due process rights.

96.   The rights of offenders concerning disciplinary procedures stem from the Fourteenth Amendment, which protects citizens from being "deprived of life, liberty, or property, without due process of. "

97.   In accordance with the constitutional mandates and disciplinary procedures as described in ILCS 5/3-8-7, and Department Rules 504, the Department has established procedures which must be followed prior to the imposition of discipline.

98.   The Department of Corrections has established rules of for adults offenders. When an offender violates these rules, some form of discipline may  be administered as set forth in DR 504 Discipline and Grievances, which clearly identifies the type of disciplinary that may be administered, and the procedures that the Hearing Investigator, Reveiwing Officer, and the Adjustment Committee must follow. (Exhibit G).

99.   That, I was deprived of my right to due process pursuant to DR 504.60(a)1-5, where the Hearing Investigator, and Reviewing Officer: a). failed to conduct an investigation per my request; b) failed to conduct an investiga- tion taking notice of the fact and evidence that the March 27, 2022 DR did not determine that the charges were appropriate where the Internal Affairs Investigation of the monitored phone calls, video visits, GTL messages, performed searches, condusted interviews, and anonymous inmate mentioned nothing about the 175 strips of papers being synthetic cannabinoids, or me conspiring, aiding and abetting, or soliciting anyone regarding synthetic cannabinoids; c) failed to interview my requested witnesses on the DR, and

18

written in the March 29, 2022 request to the HRO; d) failed to review the physical evidence which collectively was of a convincing nature that the 175 strips of paper was not synthetic cannabinoids but just ordinary typing paper I passed out to gain support for the petition on Change.org; failed to investigate and confirm that the 175 strips of paper were on the top bunk in plain view as one walk in the cell while I was in the dayroom working my job assignment; and failed to request that the 175 strips of paper be sent to a laboratory for confirmation testing as I requested on the DR.

100. That, I was deprived of my right to due process pursuant to DR 504.80 where Johnson and Gillenwater: a) failed to consider all evidence relevant to proving my innocence; b) failed to request the 175 strips of paper be sent to laboratory for confirmation testing as I requested on the DR; c) failed to interview available witnesses requested and prepare or review their statements prior to, at, and after the hearing ask I requested; d) failed to provide a written reason why available witnesses requested were denied; e) failed to investigate and consider the 2020 investigation and DR written by Internal Affairs Officer Pluckett; f) failed to state the basis for disregarding all the exonerating evidence present at the hearing; g) failed to make the Basis for Deceision complete and detailed with a factual account of what the AC believed occurred with reference to the evidence and/or testimony which lead to their beliefs, the Basis for Deceision lacked specificity of how the photograph of the test results, the contraband, and DOC 300 shakedown slip were persuasive in finding guilt of the offenses; h) failed to include in the Basis for Decision the complete rationales required for the AC to find guilt for each charge; i) failed to state the name of the field test and how it is a safety and

19

security measure to withhold the name; j) falsely claimed I requested no witnesses for the hearing, and k) falsely claimed the papers tested positive for synthetic cannabinoids.

101. While in RHU for the ninety days I suffered atypical and significant hardship by losing over forty pounds in body weight due to being denied my request for accommodation for religion diets, and being denied my right to eat nutritionally adequeate religion diets.

102. I also lost my job assignment and lost the opportunity to have several days of Earned Program Sentence Credits documented and added to my master record for completing the contract relating to the job assigment.  I also could not properly prepare for my evidentiary hearing held on April 12, 2022 of which I was in propria persona due to not have access to all my legal document.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, I pray that this Court:

A. Declare that the acts and omissions described herein has violated my rights under the Constitution and laws of the United States;

B Declare that the Field Test/NARK 20023 tests on the papers tested by Costantino violated my constitutionally protected rights;

C. Declare that Johnson's and Gillenwater's imposition of punishment based on the results of the Field test violated the due process rights of mine;

D. Declare that Costantino's, Johnson's, and Gillenwater's imposition of punishment based on the results of the Field tests interfered with and/or deprived me of my constitutionally protected right to free speech;

E. Direct IDOC to adjourn and/or expunge the record of Costantino's use of the Field tests on the 175 strips of paper, including any test results and/or disciplinary sanctions the Adjustment Committee imposed as a result of Costantino's and the Internal Affair's use of the Field Tests on the

typing papers.

F.    Permanently enjoin the IDOC from using faulty Field tests to evaluate the presence of drugs on paper correspondence or material;

G.    Order Defendants to pay compensatory and punative damages;

H.    Crder Defendants to pay reasonable attorney fees and cost;

I.    Identify all claims that this Court deems just and appropriate to the facts;

J.    Grant other just and equitable relief this Honorable Court deems necessary.

DEMAND FOR JURY TRIAL

Plaintiff demand a jury trial of all claims so triable.

Dated: January 8, 2024                    Respectfully submitted,

s/ *Valdez Lamont Jordan*

Valdez Lamont Jordan
B29482 Pinckneyville Correctional Center
5835 State Route 154
Pinckneyville, IL. 62274

STSTE OF ILLINOIS)
                 ) SS
COUNTY OF PERRY  )

VALDEZ LAMONT JORDAN'S VERIFICATION UNDER PENALTY OF PERJURY

I verify, under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Execute on January 8, 2025.

s/ *Valdez Lamont Jordan*

Valdez Lamont Jordan

EXHIBIT  A THROUGH G

RH AL-13

**ILLINOIS DEPARTMENT OF CORRECTIONS**
**Disciplinary Report**

**Type of Report:**
☐ Disciplinary  ■ Investigative

Facility: Lawrence Correctional Center          Date: 03/05/2022

Name of Individual in Custody: VALDEZ JORDAN          ID #: B29482          SMI: ☐ yes ☑ no          Race: Black

Observation Date: 03/05/2022          Approximate Time: 6:30  ■ a.m. ☐ p.m.          Location: Housing Unit 5- C lower 21

Offense(s): DR 504: ___Investigative Status___

**Observation:** (NOTE: Each offense identified above must be substantiated.)

Individual in Custody VALDEZ JORDAN B29482, is being placed in Restrictive Housing under
Investigative Status pending the outcome of an investigation. Upon completion of the investigation, it shall
be determined if JORDAN is to be cited under DR 504. Individual in Custody VALDEZ JORDAN was
positively identified by his State issued Identification Card and through Institutional Graphics.

_____
_____
_____
_____

Witness(es): _____

☐ Check, if Disciplinary Report Continuation Page, DOC 0316, is attached to describe additional facts, observations or witnesses.

| B. Costantino | | Investigative Status | | | 03/05/2022 | 6:30 |
|---|---|---|---|---|---|---|
| Reporting Employee (Print Name) | Badge # | | Signature | | Date | Time ■ a.m. ☐ p.m. |

7606

**Disciplinary Action:**

**Shift Review:** ☐ Temporary Confinement  ■ Investigative Status          Reasons: Pending Investigation

Printed Name and Badge #          Shift Supervisor's Signature          Date 3/5/22
(For Transition Centers, Chief Administrative Officer)

**Reviewing Officer's Decision:** ☑ Confinement reviewed by Reviewing Officer     Comment: _____     Date 3-5-22
☐ Major Infraction, submitted for Hearing Investigator, if necessary and to Adjustment Committee
☐ Minor Infraction, submitted to Program Unit

Print Reviewing Officer's Name and Badge #          Reviewing Officer's Signature          Date

☐ **Hearing Investigator's Review Required** (Adult Correctional Facility Major Reports Only):

Print Hearing Investigator's Name and Badge #          Hearing Investigator's Signature          Date

Procedures Applicable to Investigative and Disciplinary Reports

You have the right to appear and present a written or oral statement or explanation concerning the charges. You may present relevant physical material such as records or documents.

Procedures Applicable to all Hearings on Investigative and Disciplinary Reports

Procedures Applicable to Hearings Conducted by the Adjustment Committee on Disciplinary Reports

Exhibit A

Exhibit B

Valdez Lamont Jordan #B29482        CL: B4-AL-13    Date 3-7-22

To: Reviewing Officer

Re: Request for Interview per DR 504.50

Dear Reviewing Officer,

    The Investigative Report written on 3-5-22 by Costantino violated DR section 504.30∆ where it does not inform me of the subject of investigation

    I need to be informed of the subject of investigation so I can present my views to you regarding why I'm in investigative status. I did not violate any rules and I need your assistence with getting the necessary evidence to prove my innocence.

    I look forward to seeing you soon.

        Respectfully

        V. Jordan

cc: ULS

Exhibit C

RH AL-13

ILLINOIS DEPARTMENT OF CORRECTIONS
**Disciplinary Report**

**Type of Report:**
☑ Disciplinary    ☐ Investigative    Facility: Lawrence Correctional Center    Date: 3/27/2022

Name of Individual in Custody: VALDEZ JORDAN    ID #: B29482    SMI: ☐ yes ☑ no    Race: Black

Observation Date: 3/5/2022    Approximate Time: 6:30 ☐ a.m. ☐ p.m.    Location: Housing Unit 5- C Lower 21

Offense(s): DR 504:    601-Aiding and Abetting, Solicitation, or Conspiracy/203-Drug and Drug Paraphernalia

**Observation:** (NOTE: Each offense identified above must be substantiated.)

This Disciplinary Report is being issued to Individual in Custody VALDEZ JORDAN B29482 as the result of an Internal Affairs Investigation that will be concluded on todays date (3/27/2022). On 03/5/2022 JORDAN was placed under investigative Status. During the course of the investigation, the Internal Affairs Unit monitored phone calls via the Securus Phone System, monitored Video Visits, monitored GTL messages via GTL GENESIS, performed searches, and conducted Interviews. On 3/5/2022, the Investigations Unit conducted a search for an ongoing investigation. The Investigations Unit confiscated several contraband items from the property box an Individual who will remain anonymous for the safety and security of the Individual and the safety and security of Lawrence Correctional Center. During the search, the Investigations Unit discovered one strip of paper approximately two inches by one half inch in length.

Witness(es):

☐ Check if Disciplinary Report Continuation Page, DOC 0318, is attached to describe additional facts, observations or witnesses.

| B. Costantino | 7608 | _(signature)_ | 03/27/2022 | 5:00 | ☐ a.m. ☐ p.m. |
|---|---|---|---|---|---|
| Reporting Employee (Print Name) | Badge # | Signature | Date | Time | |

**Disciplinary Action:**

**Shift Review:** ☑ Temporary Confinement    ☐ Investigative Status    Reasons: Severity of Report

Major Shaw Ochs 5729    _(signature)_    3-27-22
Printed Name and Badge #    Shift Supervisor's Signature (For Transition Centers, Chief Administrative Officer)    Date

**Reviewing Officer's Decision:** ☐ Confinement reviewed by Reviewing Officer    Comment _(signature)_

☑ Major Infraction, submitted for Hearing Investigator, if necessary and to Adjustment Committee
☐ Minor Infraction, submitted to Program Unit

Fetzer Eeker 337    _(signature)_    32772
Print Reviewing Officer's Name and Badge #    Reviewing Officer's Signature    Date

☑ Hearing Investigator's Review Required (Adult Correctional Facility Major Reports Only):

Attebury 5536    _(signature)_    38/22
Print Hearing Investigator's Name and Badge #    Hearing Investigator's Signature    Date

**Procedures Applicable to all Hearings on Investigative and Disciplinary Reports**
You have the right to appear and present a written or oral statement or explanation concerning the charges. You may present relevant physical material such as records or documents.

**Procedures Applicable to Hearings Conducted by the Adjustment Committee on Disciplinary Reports**
You may ask that witnesses be interviewed and, if necessary and relevant, they may be called to testify during your hearing. You may ask that witnesses be questioned along lines you suggest. You must indicate in advance of the hearing the witnesses you wish to have interviewed and specify what they could testify to by filling out the appropriate space on this form, tearing it off, and returning it to the Adjustment Committee. You may have staff assistance if you are unable to prepare a defense. You may request a reasonable extension of time to prepare for your hearing.

☐ Check if Individual in custody refused to sign    Valdez Jordan (All Rights Reserved)    3-28-22
    Individual in Custody's Signature    Date

Lane    9271    Jorre
Serving Employee (Print Name)    Badge #    Signature

3-28-22    3:30 ☐ a.m. ☐ p.m.
Date Served    Time Served

☐ I hereby agree to waive 24-hour notice of charges prior to the disciplinary hearing.

_____    _____
Individual in Custody's Signature    IDE

_____
(Detach and Return to the Adjustment Committee or Program Unit Prior to the Hearing)

3-28-22    J. Jordan    B25482
Date of Disciplinary Report    Print individual in custody's name All Rights Reserved    IDE

I am requesting that the Adjustment Committee or Program Unit consider calling the following witness regarding the Disciplinary Report of the above date:

Interview inmates May upper 3 stores, Williams 5/A, & Low library worker Scheffler 0223
Print Name of witness    Witness badge or IDE    Assigned Cell (if applicable)    Title (if applicable)

Witness can testify to: I request a outside Toxicology test. I request the website Change.org with my name be looked up
Print Name of witness    Witness badge or IDE    Assigned Cell (if applicable)    Title (if applicable)

Show make
Witness can testify to:

Page 1 of 2
Printed on Recycled Paper

Distribution:  Master File
Individual in Custody

DOC 0317 (Rev. 7/2021)

ILLINOIS DEPARTMENT OF CORRECTIONS
**Disciplinary Report Continuation Page**

Lawrence C.C.
Facility

■ Disciplinary Report    ☐ Investigative Report    ☐ Disciplinary Summary    ☐ Adjustment Committee Summary

Report/Incident Date: 3/27/2022——3/5/2022            Incident # (if applicable): _____

| | ID #: B29482 |
|---|---|

Use the space below to provide any additional information.

The exact description of the paper is being withheld due to the safety and security of the institution; however, the strip of paper contained VALDEZ, JORDAN's name. After the items were confiscated, the Investigations Unit conducted a field test on the strip of paper (actual name of Field Test being withheld for Safety and Security of the institution). for synthetic cannabinoids. The field test resulted in a presumptive positive result. Photographs were taken and the contraband was secured in the Major Contraband Vault in the Internal Affairs Office. On 3/5/2022, the Investigations Unit conducted a search of JORDAN's property and discovered 175 pieces of the same paper that contained JORDAN's name and also measured approximately two inches by one half inch in length. The exact description of the paper is being withheld due to the safety and security of the institution. The Investigations Unit conducted a field test on the strips of paper (actual name of Field Test being withheld for Safety and Security of the institution). for synthetic cannabinoids. The field test resulted in a presumptive positive result. The 175 strips were confiscated, photographed, and secured in the Major Contraband Vault in the Internal Affairs Office for an Internal Affairs Investigation. Upon the conclusion of the investigation, it has been determined that VALDEZ, JORDAN conspired and attempted to introduce synthetic cannabinoids into Lawrence Correctional Center. VALDEZ, JORDAN B29482 is in violation of DR 504: 601-Aiding and Abetting, Solicitation, or Conspiracy/203-Drug and Drug Paraphernalia. Individual in Custody VALDEZ JORDAN B29482 was positively identified by O360 and through Institutional Graphics.

B. COSTANTINO  7608          3/27/2022    5:00 PM

Page  2  of  2

Exhibit D

Name: Valdez Lamont Jordan   #: R29482   CL: Seg AL-13      Date: 3-29-22

Re: Statement to Adjustment Committee to Prove My Innocence.

1. I, Valdez Lamont Jordan, swear, declare and affirm under penalty of perjury that the following information is true and correct to the best of my knowledge and belief.

2. That, I was issued a Disciplinary Report on March 29, 2022 for the offense of DR 504: 601- Aiding and abetting Solicitation or conspiracy/ 203- Drug and drug paraphernalia.

3. That, I am 100% innocent of the charges written in the March 27, 2022 Disciplinary Report.

4. That, the information written in the D/R do not support the charges of 601 & 203.

5. That, the individual mentioned in the D/R who remains anonymous makes no mention of me aiding, abetting, soliciting, conspiring, giving or receiving and synthetic cannabinoids or any other drugs.

6. That, the mentioned phone calls, video visits, GTL Messages, performed searches, and conducted interviews makes no mention of me aiding, abetting, soliciting, conspiring, giving or receiving any synthetic cannabinoids or any other drugs.

7. That, with the facts mentioned in paragraphs 4 and 5 being the case there is no evidence or proof of me and someone else conspiring which is defined as an agreement between two or more people to commit an unlawful act, nor evidence or proof of aiding, abetting or soliciting. Therefore the 601 offense should be expunged.

8. That, Regarding the 203 offense drug and drug paraphernalia, setting aside the presumptive positive test result which equates to inconclusive, which means, of evidence not leading to a conclusion or definite result. Nothing in the Disciplinary Report, no confidential source, no phone calls, no video visits, no messages, no performed searches, and no conducted interviews states the papers with my name on it has anything to do with synthetic cannabinoids or any other drugs.

9. That, the 175 strips of paper all state, Go to Change.org type in Valdez Jordan and sign petition with 4 pictures and share it. The papers were found in plain view near the door on the top bunk as you walk in the cell.

10. That, in support of turning the presumptive positive into a presumptive negative and convincing you with proof that the 175 strips of paper is just ordinary paper I typed up to give people in support of my freedom champaign I state and present the following:

11. That, Change.org is an online website anyone can go to and post any type of petition they want. If you go to Change.org type in my name Valdez Jordan three petitions will show up involving me, One about bringing parole to Illinois the other two about my case and champaign for freedom, the first two posted in 2020 the third posted October 8, 2021 by David Adams.

12. That, Since 2020 I have been passing out small pieces of paper with my full name on it asking people to have there loved ones go to Change.org type in my name and sign the petition in support for my freedom.

13. That, In August 2020 Internal Affairs Officer Pluckett conducted an investigation regarding a piece of paper sent to the Warden and Internal affairs with my name on it in reference to a Change.org petition. Officer Pluckett interviewed me, showed me the paper, asked me if I wrote the paper, I told him yes. He asked if I posted the papers I told him no. He asked if anyone gave me permission to post the papers I told him no. He asked if I was going around trying to get prisoners to sign a petition I told him no. I explained to Off. Pluckett that I was asking inmates to

have their loved ones go to Change.org and support the petitions for parole and my freedom campaign.

14. That, I received a Disciplinary Report for unauthorized posting, I pled guilty, Off. Pluckett told me I could ask people to ask their loved ones to go to sign my petitions but I could not post anything without permission. Please review the investigative report and Disciplinary Report and speak with Lt. Pluckett.

15. Please review this paper copy of the article written by David Adams regarding my case which is the same article on Change.org, review this paper newspaper article by Ted Pearson referring to my case and the Change.org petition, and please re review these other documents and letters pertaining to the same thing and please make copies and attach them as evidence.

15. That, if you do not believe any of this then have all 175 strips sent to the Illinois State Police for testing.

Exhibit E

# Justice Delayed Is Justice Denied: Illinois Attorney General Challenged To Fulfill Campaign Promise, And Free Wrongfully Convicted Political Prisoners Of Madison County

*Posted by **David Adams** on October 8th, 2021*

Imagine if you lived in a society where your local police or county sheriff office could create false criminal charges against you and even pay confidential informants to lie in court, implicating you in a murder case or other violent crimes. Then imagine that with the help of state law enforcement officials, jury selection manipulation tactics are implemented to select jurors most favorable to the prosecution's case. Murder charges are of such a serious nature you definitely need a hired attorney, but what if you're financially unable to secure private counsel, and the court appoints a lawyer for you who just so happens to be a special defender selected by the judge, and a former law partner of the state attorney prosecuting your case. This scenario wouldn't exactly be the ideal situation for any defendant facing imprisonment that could send them to the slammer for decades.

There are so many people in our nation who have been indicted, tried in a court of law, and then subsequently convicted of crimes that were born out of false charges drummed up by dirty cops and corrupt prosecutors. Then, many are sentenced to serve time in a penitentiary, away from their families and loved ones for years. Some sentences are so long that convicts often are resolved in their fate, and try to cope with their time the best they can. Others are consistently and diligently spending their time investigating how such an injustice could have happened to them.

After decades of incarceration many of those who were wrongfully convicted are transformed into A students of their own cases. Their diligence in researching the law rewards them with the knowledge of having learned the intricate details of their criminal trial that resulted into their conviction. Once the ugly truth of how such an injustice happened to them, and now with actual proof that they were wrongfully conviction in hand, you would think that even a court appointed lawyer would try to mount an appeal with claims based on new evidence that should get their conviction reversed. However, many appellate counsels are uninterested in newly discovered evidence, and instead they often times try to get defendants tp drop all of the claims within their appeal which proves their innocence, and encourages them to take a deal that's brokered with the state prosecutor, and usually entails a meager sentence reduction. Then if deal is refused, and a request is made to pursue the claims of innocence, some are abandoned by their lawyers (who if you remember, are routinely a former law partner of the prosecutor) for years, and in some cases their case are even taken off the court docket, leaving them in an appellate limbo.

Much of what I've described is akin to a society ruled by dictatorship, or perhaps a complete totalitarian system of government oppression. Trumped up charges which entail paid witnesses, suppression of exculpatory evidence, jury tampering, police and prosecutors who lie, and judges who seem complicit by not allowing defendant's claims to be fully developed on appeal, and taken judicial measures to ensure that a higher court never reviews a case on appeal, is probably the most partisan form of jurisprudence imaginable within any system of government. Unfortunately, there are similar patterns and practices that I have described regarding these systems of injustices right here in America. This article is about four men (James Evans, Valdez Jordan, Larry Greer, and Jeffrey Ewing), whose stories are simply incredible on their own individual merits, but collectively tell a very dark and desolate tale of corruption by law enforcement in southern Illinois. No major media outlet has ever written or even broadcasted about these cases collectively in conversations to line up the disturbing parallels, and patterns of practice within the Madison County Illinois justice system. Quite frankly, no one ever cared because they are all black men who caught the ire of police, and prosecutors want society to believe that they are all violent murderers who belong behind bars.

For over three years now, I've reviewed thousands of documents, interviewed a volume of witnesses related to the criminal cases of all of these men. What their cases have in common is they were all prosecuted by the same state attorney (Keith Jensen) and at some point, whether during their individual trials or appeals, were represented by the same defense counsel (Randy Hale). Similarly, each and ever one of their cases were born out of the investigative work of former Madison County Sheriff Bradley Wells (who is currently the Chief of Police in Woodriver Illinois). While I have weighed the credibility of many people that I have interviewed, the

record in most of these cases tell a compelling story of its own, and adds tremendous credibility to the accounts of various people from the city of Alton Illinois.

**Background**

In the mid to late 1990s the city of Alton which is just east of the Mississippi River in southern Illinois, was under siege, just like most urban towns in America, as it was in fact the height of our nation's drug epidemic. The proliferation of drug addicts seemed endless, and the illegal drug trade left a harrowing volume of carnage in its wake. Even in the small midwestern town of tiny Alton Illinois, violent murders were on the rise. Some of the victims who fell prey to street violence are why this story is even being told. James Evans was convicted of killing young Nekemar Pearson, Valdez Jordan was convicted of the killing of Kenneth Spann, Larry Greer was convicted for the killing of Brian Warr, and Jeffrey Ewing was convicted for the killing of Dwight Riddlesprigger and for the killing of Antonio Ray years later.

Incredibly, none of their cases actually contained any evidence of any kind that directly linked them to the killings they were individually accused of committing. In fact, all of their cases collectively were highly circumstantial and weak cases that were tried before all white juries. To bolster the state's cases against these men (who all admittedly were no angels), the prosecutor elicited the assistance of professional "jail house snitch Demond "Duke" Spruill and Jody Wesley, who claim that the four men had all confessed during individual conversations with them in the Madison County jail. Then in 2005 the ugly truth surrounding their convictions was revealed, when an Appellate court overturned the murder conviction of a man name Jeramy Brown (who was white), after discovering that the state had repeatedly used Demond Spruill (who testified that Jeremy Brown confessed) in a volume of other murder cases where he claimed others had confessed also, related to other separate murder cases. The court's ruling included harsh language for Madison County prosecutors for their recycled use of Spruill, citing that "every time the state has a weak case, this guy (Demond Spruill) shows up, and the jail cell becomes a confessional despite astronomical odds." Spruill's testimony was the most damaging piece of evidence in each of their cases (Evans, Jordan, and Ewing), with the exception of Larry Greer, who professional "snitch" Jody Wesley testified against.

Jeramy Brown's case pertaining to the killing of Michael Keller is very telling juxtaposed to similarly situated black defendants such as Evans, Jordan, and Ewing who were all convicted of murder and the state's star witness in their cases was also Demond Spruill. Despite the extremely violent and heinous details of the Keller murder, and Brown actually having made incriminating statements to Spruill during a state eavesdrop operation, that included a solicitation of murder plot by Brown to have Spruill kill state witnesses who were scheduled to testify against him, the Appellate court tossed out Brown's conviction because it ruled that Spruill was in fact working as an agent for the state during the time in which the 6th Amendment grants a defendant right to counsel when questioned by any arm of the prosecution (Read Jeramy Brown's conviction reversal decision here). The state eventually convicted Jeramy Brown for the murder of Michael Keller, and then had the conviction upheld by the Illinois State Supreme Court.

Mean while the cases of Evans, Jordan, Ewing, and others haven't even been allowed to move forward in the appeal process for nearly two decades, because Madison County courts won't adjudicate the claims in their appeals, which appears to be a stalling tactic to prevent errors, violations of the law, and other highly problematic elements of their convictions from being fully developed on the record in their respective cases. To some attorneys that I have interviewed regarding these cases, I appear ignorant to the law by claiming that the cases of these men have all been in the "post conviction" stage for at least 18 years. They are quickly educated on the pattern and practices of the Madison County Illinois court system. To many the process seems rather confusing because the state of Illinois has long established that "post conviction" proceedings should only take a little more than one year to conclude, but apparently that standard doesn't apply to the Madison County Courts, and the inordinate delays in these cases seems unconstitutional. There were blatant violations of the law related to the prosecution of their cases and much of the following may be exactly why:

**Confidential Informants and Perjured Testimony**

Although Demond Spruill was a state witness who regularly testified in murder trials (some say just about every murder case in Alton), his credibility never appears to come under scrutiny by the many jurors seated for trials in which he testified in. It seems as though all murderers in the city some how run into Spruill (who is a convicted felon himself) in the county jail and then pour out their hearts to him, while confessing to having

committed murder. Its suspect and highly improbable to have ever occurred, but Spruill wasn't the only one who played a major role in helping the state prosecutors to convict criminal defendants. Larry Greer was also utilized as an informant by police and prosecutor Kieth Jensen. Greer admittedly was a drug addict that had been a "laced" smoker (Marijuana, LSD, Heroin, and Cocaine) off and on since the age of 12 years old.

Madison County Sheriffs took advantage of Greer's addiction by providing him with stories that fit a theory that they fabricated to file criminal charges against people they wanted off the streets. During a interview with Mr. Greer from the Graham Correctional Center in Hillsboro Illinois, Greer told TPC that he was provided with information about criminal cases, study the material, advised to implicate himself in those cases, and then in exchange he would be paid which he used to supply his drug usage. Greer has even said that he was allegedly given back his $1500 bail money on one occasion, and he was even expecting more money from Madison County Sheriff Bradley Wells in exchange for testifying falsely against people.

Just like Larry Greer, Jody Wesley also falsely testified against people at the behest of police and prosecutors. An Appellate Court judge even gave credibility to both Greer and Wesley's false testimonies in a ruling after highlighting an incident where Greer and Wesley were traveling in a prisoner transport vehicle together, and jokingly discussed that "lyng ain't snitching" and "we're gonna say what ever detective Bradley Wells and prosecutor Jensen want us to say, to get out of jail."

Also, there are others whom say they were either under the influence of alcohol or narcotics when they witnessed certain crimes, but Alton police and county sheriffs used their testimonies to help prosecutors convict defendants of murder. Some who spoke on conditions of anonymity say they were using drugs for nearly an entire week before the murder trial for which they testified in on behalf of the state, was actually high on drugs during their testimony, and say the prosecutor knew about it. One witness in particular said he was so high on drugs that he doesn't even recall what he actually testified to at the trial. None of this information was ever made known to the trial jury, and the defense counsel never tried to impeach the witness' statements or even attempted to inquire about the witness' drug use. "It was a common practice for Alton police and county sheriffs to use information from people who struggled with drug addiction and then ran afoul of the law", a witness said. Police intimidation tactics were often used to pressure people to lie and make false statements, in exchange for making their personal criminal charges go away. Official documents even reveal how the police even allowed violent offenders go free after they lied on the stand for police and prosecutors.

**James Evans**

In the summer of 1995 a home invasion occurred at the residence of James Evans. he was robbed of some minor personal items and expensive car radio speakers. Word got around who the masked perpetrators were, and young Nekemar Pearson of Alton was one of the people identified as having been involved in the home invasion at Evans' home. Pearson eventually went missing around June 24 of 1995. He was under court ordered home monitoring pending trial for a murder (the killing of Willie Nichols). After Pearson went missing it was rumored that Evans killed him in retaliation for the home invasion (but on the day police claim Pearson was last seen alive, there were reports that Pearson was being chased by family members of Willie Nichols, who were shooting at him as he fled). Police reports reveal how another man name Marcus Holloway gave police a statement regarding the home invasion, implicating himself and others. Even though a volume of people participated in the crime (if you follow the state's theory), young Nekemar Pearson was believed to have been the only one killed for his involvement.

Evans who had no prior history of violence was eventually charged with Pearson's killing. It was rumored that Madison County Sheriff Bradley Wells was the source of the rumors which fingered Evans for the Pearson murder. At his trial the state didn't offer any direct evidence which linked Evans to the crime except hearsay testimony. Many of the witnesses were on the hook with the police and had pending criminal charges of their own, like Clifton Wheeler, Larry Greer, and Jody Westley. Wheeler implicated himself in the Pearson killing by testifying that he witnessed Evans kill Pearson in a wooded area in Godfrey Illinois where his remains were discovered, but court transcripts show that Wheeler lied on the stand, and prosecutor Kieth Jensen knew about it. Wheler had already been sentenced in a separate murder case, but when questioned on the stand under direct examination, he denied receiving anything for his testimony at Evans' trial. Kieth Jensen who represented the state at Wheelers sentencing was well aware that he received a plea deal for his testimony in the Evans case, and that Wheeler had perjured himself (a violation of the law). More importantly, Jensen

concealed Wheeler's plea deal from the trial jury, which not only cast doubt of Wheeler's credibility, but highlights how a state prosecutor knowingly broke the law in the Evans case (Read an excerpt from Clifton Wheeler's perjured testimony in the trial of James Evans here). Clifton Wheeler had in fact already made a plea deal with the state (Kieth Jensen who prosecuted Wheeler) prior to testifying at Evans' trial. If Wheeler was telling the truth about witnessing Evans kill Pearson, then why did the state knowingly break the law? (Read Clifton Wheeler's Sentencing Plea Deal here).

Larry Greer and Jodi Westley who also testified against James Evans, are admitted liars and the trial jury never heard about the intricate plea arrangements they both brokered with the state prosecutor in exchange for their testimonies (Read an excerpt from an official court document highlighting Greer And Jodi Wesley's admissions to lying for state officials in exchange for plea deals here). For instance, Greer was in trouble with criminal charges and was able to broker a deal to not only have his charges dropped, but even had authorities pay him for false statements against Evans (Greer received his $1500.00 bail money back as payment). The state's case was based on hearsay testimony from known felons, admitted liars, and was highly circumstantial. That's where the state introduced Demond Spruill who claims that Evans confessed to him while at the county jail. A jury convicted Evans of the Pearson murder, but that wasn't enough for state prosecutor Jensen. Evans was then indicted and tried in a weird murder conspiracy. The state alleged that Evans hired a man name Robert Fletcher.(best friend of Nekemar Pearson, who Evans was convicted of killing) to kill Lester Warr, the father of Briann Warr (who police say was suspected of aiding Evans and Clifton Wheeler in the Pearson murder). Along side Evans, a woman name Latosha White-Hamilton was charged with conspiracy to commit murder also.

The state alleges that Evans instructed Hamilton to give a man name Tommy Rounds (a known police informant and a cousin of James Evans) a gun to kill Lester Warr. Hamilton who resides in the state of Missouri, told TPC that the state's claim of a murder conspiracy was "a complete fabricated story." Hamilton says Evans only requested that she "look out for Rounds," who had just came home from being incarcerated. Rounds was wearing a wire for state prosecutors when he came home and eventually met with Hamilton. Hamilton says she believed that Rounds would be in need of some money as most who are recently released from incarceration do. "He told me that he needed money to get back to his hometown in Illinois," and kept calling her over an extended period of time. Hamilton went on to say that when she finally met with Rounds, instead of requesting the money he had previously asked for, he asked if she had a fire arm, and said that she only had her late husband's old gun that had been in the closet for years. She said that at the time she had two of her small children and her young nephew living with her, and wanted the weapon out of her home any way, so she subsequently sold the weapon to Rounds for $50.00. Hamilton admits selling a gun in Illinois without a license was a violation of the law, but denies being involved in any kind of murder conspiracy, and when she learned that Rounds was in fact wearing a wire during their brief exchanges, she advised her attorney (court appointed lawyer) to obtain the recordings. She says the recordings would prove that their was no conspiracy surrounding the sale of a firearm to Tommy Rounds.

Rounds also wore a wire for the state while having conversations with Evans at the county jail. Some of those recordings were played during Evans' trial, but must of the recordings were inaudible. TPC has obtained transcriptions of some of those recordings, and the dialogue doesn't follow a normal conversation pattern, let a lone a conversation about a murder conspiracy. Evans was subsequently convicted of the conspiracy to commit murder count also. He was sentenced to a total of 107 years in the state of Illinois Division of Corrections for both cases. Evans who has always denied both killing Pearson and conspiring to have Lester Warr killed, has stated that he never had any conversations with Spruill, and that the recordings played during his trial were edited (he claims the trial recordings were a combination of multiple conversations edited together to appear as one). and one of his appellate claims was regarding those trial recordings.

Hamilton who was very close friends with James Evans also said that police repeatedly interrogated her, while threatening her to tell them something incriminating about Evans. Hamilton says they held her in the county jail for over four months in an attempt to get her to make a statement, but says she was eventually set free when the state dropped the first degree murder conspiracy charges against her. She would fight lesser charges for years until she pled guilty to the solicitation of a firearm without a license. Hamilton said that the so called conspiracy tapes with her and Rounds have never been produced by the state.

Then in 2001, years after Evans had already begun serving his sentence, Evans received a letter from Appellate Defender Dan W. Evers, who forwarded a copy of a police report from an Alton School Resource

officer. In the report Det. J. Cooley writes that he observed Nekemar Pearson walking down a street in Alton on July 3, 1995, and nearly two weeks after the day that state prosecutors allege that James Evans had killed him. Attorney Evers went on to state in his communication to Evans, that he discovered the police report in some paperwork that was sent to his office. The very existence of Det. Cooley's report establishes that the police was aware that Pearson was seen alive after the day they told a grand jury and a trial jury that Evans had killed him, and its also clear that police officials had such discovery long before the state sought an indictment of Evans for the Pearson murder. This highly exculpatory document was suppressed by police and the prosecutor's office from Evans' defense, and his trial jury never saw it (Read the Appellate Defender Letter to Evans and the exculpatory police report from police officer J. Cooley here).

Moreover, Evans first requested the trial recordings discovery (associated with Tommy Rounds) back in 2001, and despite a mountain of court orders directing state officials to turn the items over to Evans, the state to this day has never complied. The state's refusal to comply with court orders with impunity, coupled with perjured testimony, paid witnesses, and the suppression of exculpatory evidence clearly establishes that at the very least, James Evans as a matter of fact and law, was denied a fair trial under the U,S, Constitution.

While I have already written a volume of other articles pertaining to the case of James Evans, his story can best be summarized in this article: "Justice Delayed Is Justice Denied: The Incredible But Surreptitious Conviction Of James Evans Summarized.

**Larry Greer**

Larry Greer is very well known to the Alton police and the Madison County Sheriffs office, as his drug addict led him down a destructive path that culminated in a 40 year prison sentence. While Greer is setting in a Illinois state prison convicted of first degree murder, he is just as much a victim as the man for whom he is charged with killing. His personal struggles with the law and addiction made him extremely vulnerable, and the police exploited it to the fullest. Greer who is an admitted liar, testified against James Evans during his murder case. Greer told TPC that what he told Evans' trial jury was in fact all lies, much of which was created and fed to him by police (Bradley Wells) and state prosecutor Kieth Jensen.

They used scare tactics to make Greer adopt their fabricated stories under duress. Greer was charged with killing Brian Warr, even though it was in fact a man name Robert Fletcher who pulled the trigger. Brian Warr and Greer were good friends (Warr was also a mutual friend of James Evans). One fateful night outside an Alton night club, Greer and Warr were seated in a vehicle when Fletcher shot and killed Warr. Greer rushed Warr to the hospital, but cops held Warr hostage when he initially wouldn't identify who the shooter was. Greer told police that he ducked when shots were fired and didn't see the shooter. The police then threatened to charge Greer with obstruction of justice, and for a heavy drug user like Larry Greer, a stint in the county jail would be extremely painful for him.

So Greer played ball, by giving in to police demands and adopted a story that alleges he was directed to transport Brian Warr to the club in Alton that night at the behest of James Evans, and for the purpose of him being killed by Robert Fletcher in a conspiracy that Greer alleges was orchestrated by Madison County Sheriff Bradley Wells and State Prosecutor Kieth Jensen. "It was all made up," Greer told TPC. "They kept getting me to implicate myself more and more every time I lied for them," he said. Greer says they even paid him on multiple occasions to lie for them. It was monies he admits he used to support his drug addiction.

Greer also states that he was even "expecting more money" for his cooperation. Greer's claim that he was paid by police and a prosecutor was corroborated by Madison County Sheriff Bradley Wells, when he admitted given Greer money during testimony in a trial, and while he (Wells) even told the court that state prosecutor Kieth Jensen approved giving Greer $1500.00 bond money back that was posted for him in his own criminal case, in exchange for testifying at a Grand Jury indictment hearing (Click the link to read an excerpt from Madison County Sheriff Bradley Wells Testimony in a trial).

Only when it was time for Greer to provide their fabricated story before Robert Fletcher's trial jury, Greer had become exhausted with telling lies for the prosecutor's office, and refused to go along with their story (Click this link to read an excerpt from court transcripts of Greer's exchange with prosecutor Kieth Jensen in open court, where Greer gives details of how they wanted him to change his story in the James Evans case, and how prosecutor Jensen told him and others what to testify to in exchange for deals in their own criminal cases). He was subsequently charged with the murder of Brian Warr, despite the fact that he actually drove Warr to the hospital that night. Greer even gave police one of the initial statements during the Warr homicide investigation.

To add insult to injury, Greer was promised immunity for his fictitious role in the Warr murder conspiracy, but when he wouldn't go all the way and connect the dots for the state, by testifying falsely and implicating James Evans as the master mind who hired Robert Fletcher to kill Brian Warr (a scenario that would have made Evans eligible for the state's death penalty), his immunity was stripped away (a violation of the law) which ultimately led to Greer's conviction in the Brian Warr killing. During an interview with Greer from the Graham Correctional Center in Hillsboro Illinois, Larry Greer told TPC that "Everything I testified to was given to me by the police (Bradley Wells) and the state (Prosecutor Kieth Jensen), now I'm locked up for the story that they made up (Read Larry Greer's Affidavit here: _Affidavit of Larry Greer_).

**Valdez Jordan**

In the case of Valdez Jordan, it was a routine traffic stop that became very odd when a state cop made a very strange request of Mr. Jordan who was riding down an Alton street when he was pulled over by an Illinois state police officer. The cop asked Jordan why his car was swerving when the cop was behind him? Jordan explained to the officer that he had dropped something and was trying to retrieve it. The state cop ran Jordan's license and registration and came back to his vehicle and advised Jordan that he checked out, that he wasn't in trouble, but a Madison County Sheriff name Bradley Wells had overheard him calling in his info to police dispatch. Wells contacted the state cop and asked him to request Jordan to stay there momentarily because he would like to speak with him. Jordan says he was reluctant, but stayed until Wells arrived.

When Wells pulled up Jordan says he motioned for him to come get inside of his police cruiser, and Jordan got in. Wells then asked Jordan if he knew who killed "Pookie" (Nekemar Pearson). Jordan states that he told Wells that he doesn't know anything about that, and then Wells allegedly stated "you know who killed "Pookie," Raven (James Evans) killed "Pookie." Jordan says Wells asked him about his gang affiliation and he responded "I think you already know the answer to that." Jordan said the conversation got even stranger, as Wells appeared to solicit him to do something to James Evans, because he had allegedly killed his "homeboy," and was selling drugs on his gang's turf. Jordan says he kept his conversation with Wells brief and then got out of his cruiser.

Months later Valdez Jordan was locked up in the Madison County jail facing murder charges related to an Alton "Crap house" robbery that resulted in the killing of a man. Jordan says he was called by jail correctional staff for an attorney visit, but when he got to the visiting area, no attorney was present, instead it was Madison County Sheriff Bradley Wells. Jordan alleges that Wells offered to assist him with his current criminal case, stating that he could "make the charges disappear" if he was willing to testify to a certain "scenario" (that essentially fingered James Evans as the person responsible for the killing of Nekemar Pearson). Jordan states he reiterated to Wells that he had no knowledge pertaining to that case, and that he didn't need his assistance with his own criminal case because he was innocent of the charges. Jordan says that he was called on at least another occasion for an attorney visit in which it was Bradley Wells again. He states that he was requested by Wells to assist in the Pearson killing by providing false testimony against Evans for a second time, but only he was given a warning upon leaving that particular meeting with Wells, who allegedly stated "you're going to regret not cooperating with me."

Jordan believes that Well's parting words to him that day resulted in the recruitment of Demond Spruill to lie and fabricate a confession, allegedly provided by Jordan regarding the killing of Kenneth Spann at the Alton "crap house" robbery for which Jordan is now serving a 35 year sentence. Jordan also believes that arrangements began immediately after he last spoke with Wells at the Madison County jail, because as he entered the cell block Demond Spruill was being escorted to the same area for an allege attorney visit. He says he even warned Spruill that there was no attorney waiting for him, and instead "it was Bradley Wells out there." Jordan also believes that was probably when the negotiations for Spruill to testify against him were set into motion. Valdez Jordan has always maintained his innocence related to the Kenneth Spann homicide, and has stringently denies having confessed the crime to Spruill or anyone else.

However, Demond Spruill would go on to later testify against Valdez Jordan while alleging that he had confessed to the "crap house" killing. Mr. Jordan believes that one of the main reasons he was fingered for the "crap house" shooting is because he refused to lie for cops who appeared to be desperately trying to develop a murder case against James Evans by any means necessary (official records in the form of a police report that contains Spruill's initial statements to police, establishes that the tip from a confidential informant in the "crap house" killing that Valdez Jordan was fingered for, ironically originated from Madison County Sheriff Bradley Wells) (Read the Affidavit of Valdez Jordan here).

Mr. Jordan was subsequently convicted of murder in what could be described as another weak Madison County prosecution with a known professional "jail house informant," Demond Spruill cast as the state's star witness. Although Spruill's appearance was highly problematic (which I'll explain later in the article), there were other witnesses who provided vague, opinionated, circumstantial, and exculpatory testimony that collectively could never establish as a matter of fact that Valdez Jordan, or anyone else for that matter, was actually the gunman beyond a reasonable doubt during the fateful earlier morning hours in Alton. Although Jordan admittedly had been at the "crap house" gambling earlier, he says he left after having "craped out" (lost all his money), and wasn't present during the robbery that resulted in the killing of Kenneth Spann.

State prosecutor's however, pitched the theory to the jury that Jordan lost his money and came back armed in a violent rage to rob the place. During the investigation it was established by a volume of eyewitnesses at the "crap house" when the shooting occurred, that the perpetrator had a sheer stocking cap over his face which made it difficult to identify him. At Jordan's trial no witness testified to observing Valdez Jordan shooting Mr. Spann, hell no one testified to even seeing the actual shooter's face. Only one witness stated that he saw Valdez Jordan on the street outside of the "crap house" holding a gun after the shooting, but the same witness also testified to seeing others with guns in their hands (like a man name Jarvis Brown). Some people in Alton familiar with the "crap house" told TPC that "the place had been robbed multiple times in the past," and "there was a lot of money floating around in there. Everybody in there probably had a damn gun, and more than likely had taken their weapons out to protect themselves when the shooting started," they said.

That witness who was the sole person, who claim to have seen Valdez Jordan at the scene of the crime immediately after the shooting, spoke on conditions of anonymity, and told TPC that he was "under the influence of mind altering drugs the night of the killing," which was an important detail related to the case that wasn't disclosed to the court, Jordan's defense, nor the jury. It's important to note here, that the witness didn't actually see the shooting take place. His testimony only provided an alleged vantage from outside of the "crap house" after the place dispersed with people fleeing the area after the gun fire.

Some witnesses testified that they believe the person who committed the crime was Valdez Jordan because of the sound of the shooter's voice. One of those witness (Ramando Alexander) who testified and claimed to had been knowing Jordan for about 6 months, a statement that Jordan says was untrue. He denies ever having known the witness. Court documents show that Alexander was also under indictment for an unrelated first degree murder case, which the state subsequently reduced to a lesser charge of unlawful restraint (in the killing of Antonio Ray) for his cooperation and testimony against Valdez Jordan. Court trial transcripts show how on cross examination it was revealed that Alexander actually had a deal to testify against Valdez Jordan, and despite a signed agreement being introduced into evidence, Alexander repeatedly denied it (Read the trial testimony of Ramando Alexander here). Also, Alexander's statement to Alton police was entirely different from his trial testimony, as Valdez Jordan's lawyer rightfully and thoroughly impeached on cross examination during the trial (Read an excerpt from Ramando Alexander's statement to Alton Police here). Another witness (a known drug addict) who testified and also pointed at the sound of Jordan's voice, was the sister of a former girlfriend of Mr. Jordan. Only in her original statement to police, she says that she knew the voice, but couldn't put a face with the voice, and then only after Alton police officials suggested Valdez Jordan's name to her did she suddenly realize who the perpetrator was and changed her statement to identify the shooter to be, in her opinion Mr. Jordan, according to her testimony. That witnesses admitted that she had an outstanding arrest warrant for unknown charges squashed by Alton police and the prosecutor's office in exchange for her testimony against Valdez Jordan. Moreover, Alton police arrested a witness four days before she was to testify in Jordan's trial.

Her original statement to police placed Jordan at her apartment at the time of the shooting, while in police custody her statement suddenly morphed into placing Jordan at her place after the shooting, and claimed that Jordan told her that he heard the "crap house" had been robbed and he was going to find out more about it (placing doubt on Jordan's claims of not being on the scene at the time of the crime). Also, arguments from Jordan's defense counsel in court transcripts from a post trial motion hearing, disclose how the witness was actually held in police custody until the actual trial, and then immediately upon the completion of her testimony, she was released from police custody on her own recognizance with the approval of the state prosecutors (Read an excerpt from Valdez Jordan's post trial motion hearing here).

and is currently mounting an appeal to his original federal "writ" request, because he essentially wasn't afforded a hearing at all due to having been appointed an unlicensed attorney *(Read Valdez Jordan's litigation documents against Madison County here)*.

Alternatively, I'm certain that Madison County officials can muster up rationalizations to refute Mr. Jordan's claims, or for any one of the individual stumbling blocks that seem to constantly fall in the pathway of final resolution in all of these cases, but as it has been clearly demonstrated here by just a sample of a volume of official documents of the record showcased in this article, an extremely damning portrayal is revealed of the Madison County courts, its system of justice, and the policing tactics of some within its law enforcement agencies. The process of moving through the appellate courts are long and burdensome enough for those seeking relief, and it is exacerbated when those who are convicted are denied their constitutional rights.

Looking at their cases from a broad overall perspective, considering the evidence which proves that officials broke the law, and seem to refuse to allow their appellate cases to be fully developed should raise a red flag. Although they were all convicted of very heinous crimes of violence, the state's cases against them collectively were all born out of suspicious investigative work of the Madison County Sheriffs department, Alton city police, and was executed in the courts through hearsay testimony from known criminals who brokered back door deals with dirty, corrupt, and extremely evil law enforcement officials. These officials who not only destroyed the lives of all of these men and many others, may have even denied the families of the subject homicide victims in their cases the closure that most grieving families seek. It is quite plausible that the actual killers who committed these crimes may in fact still be at large, and that's a very frightening reality for any community.

The Attorney General of Illinois Kwama Raoul ran on a criminal justice reform platform and has been very vocal regarding his commitment to insuring that torture chambers like the one John Burge of the Chicago police created never occurs again. In fact the AG continues to promote the highly touted Conviction Integrity Unit in Cook County Illinois, which was born out of the Burge ordeal after the full extent of how tortures were occurring to force confessions from innocent people. While such efforts should be applauded pertaining to this vital safeguard of public safety, Mr. Raoul must be mindful that Cook County doesn't represent the the entire state of Illinois.

I've personally spent three years researching, reading court documents, and interviewing people related to some of these cases, and all though some of the injustices were committed during the height of America's war on drugs, the reminisce of "good ole boy" style justice, and archaic "sundown town" ideology in Madison County continues to linger and is still just as pervasive in 2021, as it was during the American "Jim Crow" south era. An investigation into how Demond Spruill was utilized by law enforcement officials to send defendants to prison for decades is at least warranted related to these cases. The record is so disturbing that it possibly explains why court officials refuse to adjudicate the claims of these defendants. Madison County appears to be an out of control system of injustice, where there are those who are wrongfully convicted and held in captivity for the purpose of maintaining political expediency.

Mr. Raoul, if there was ever an opportunity to honor the promises you promoted during your political campaign, Madison County Illinois is without a doubt the grassroots benchmark to initiate the kind of criminal justice reform you promised, and your constituents in Southern Illinois so desperately need. Mr. Raoul we challenge you to do something to make a change, to make a difference, and go to Madison County Illinois. I only wish that I could personally have done more to aid suffering people. God speed.

The People's Champion Blog

I'm Journalist and Crime Blogger David Adams

[left column partially cut off]

...s letter. I thought
...d I prepared to take
...Church and set up
...me that I needed

...t cleaning my
...d lessons that I
...I started throwing
...ause there was so
...in of collectable

...n and found the
...a hand. The hand
...range the cosmos
...inting was perfect.
...the display cases
...life, and I named it

...? If you do, what

...same question. His
...t forever.
...e that was 50 years
...as simply a coin-
...'ve created and
...hat it's a miracle. I
...ement, and you told
...story about how it

**Dennis Hunt**
East Alton

...ges letters to the
...variety of view-

...er writer will be
...l will consist of

...unt of more than
...g to conform to
...l, brevity, clarity
...ppropriate for a
...on.

...nd must include
...and phone num-

...ill bear the name

...will be edited to
...ess and to con-
...ding libel, brevity,
...ned inappropriate.

---

...shortages. In Iowa, schools are having a hard time sourcing the quantity of food needed for their breakfast and lunch programs. Food producers are missing inputs like resin for packaging, while small businesses across the country are facing shortages of bulk items like utensils, cups and to-go boxes.

A food truck owner in Maryland told ABC News, "It would be one thing if I couldn't find french fries.

...demand for processing at the L.A. ports.

First and foremost, union hour rules for longshoremen and truckers have resulted in port operations not matching the influx of ships. The Port of L.A. has been operating at only 60% to 70% of capacity, closed evenings and Sundays.

President Joe Biden announced on Oct. 13 that the port would switch to 24/7 operations. But

...responding efficiently to the between states when transporting goods. By ship (for example, between Washington State and California) could be cheaper and more efficient.

To add insult to injury, the L.A. ports just announced a new fine system for containers that remain at the ports too long, even though there aren't enough trucks on the road to transport the containers. Additionally, Biden's impending vaccine mandate would worsen the

...worse.

This crisis is proof that government bureaucrats and government-controlled unions cannot, and often will not, change course when the market demands it. It is time to remove the red tape for the long term to both solve the current crisis and prevent future ones.

*Tori K. Smith is Senior Policy Analyst in Trade Policy in The Heritage Foundation's Roe Institute for Economic Policy Studies.*

---

## THEIR VIEW

# Petition asks Raoul to investigate Madison County

**By Ted Pearson**

A new petition on Change.org is potentially shaking things up in Madison County, Illinois. The petition calls upon Illinois Attorney General Kwame Raoul to investigate "wholesale corruption" in that county. It charges that "Black people in Madison County, Illinois, have been framed by a system of prosecutors and judges utilizing a group of professional prison 'snitches' who lie and say that suspects 'confessed' to them."

Central to the charge in the petition is the repeated use of the same jailhouse informants, or "snitches," in convictions with sentences ranging from 40 years to life. Of nine such people convicted this way, all but one are Black.

Common to all nine cases is testimony by Demond Spruill, who "befriended" suspects in the Madison County Jail and then testified that they confessed to him their part in murders. There was no direct evidence

linking any of them to the crimes for which they were convicted. The petition charges that prosecutors suppressed exculpatory evidence, ignored eyewitness accounts pointing to other suspects, paid witnesses to testify, and threatened potential defense witnesses to not testify.

The petition was initiated by friends and family of James Evans, who has been incarcerated for 22 years, convicted of murdering Nekemar Pearson who went "missing" on June 24, 1995. His body was found six months later in Godfrey, five miles from Alton.

In their case against Evans prosecutors spun an intricate web in which Evans ordered the murder of two witnesses to Pearson's killing, although he was never charged in those killings. Police reported they saw Pearson alive 10 days after his alleged murder, a fact withheld from Evans' defense that came to light after his trial. This completely shreds the prosecution web enveloping Evans.

Evans' cousin, Tommy Rounds, wore a wire and said he recorded a "confession" by Evans. A recording played in court against Evans was made of fragments recorded by Rounds spliced together. Prosecutors have defied court orders to produce the original recordings and the recording played at Evans' trial. They say they have "lost" the evidence.

Spruill has testified in the same way against nine men, eight Black and one white. Spruill got a "get out of jail free" card in exchange. Jody Wesley, who is white, and another "snitch" that testified against Evans were given substantially reduced sentences for crimes for which they had been convicted. The court allowed Wesley to testify that Larry Greer told him that Evans had confessed to Pearson's murder, hearsay evidence.

Valdez Jordan, Jeffery Ewing and Larry Greer are among those fighting convictions by the same prosecutors and professional "snitches."

The chief prosecutor, Keith Jensen, was later appointed an Associate Judge in Madison County in 2007. He retired at the age of 62 in 2014. John Lakin, a deputy Madison County sheriff, is now the sheriff of Madison County. Bradley Wells, another Madison County deputy sheriff, today is the chief of police in Wood River, Illinois.

The petition notes that "Kwame Raoul was elected on a promise of rooting out corruption in local police and prosecutors' offices throughout the state. .... [Such] corruption has enveloped counties across the state." It ends by asking people to add their voices "to those demanding that AG Raoul act to end this situation" in Madison County.

*Ted Pearson is co-chairperson, emeritus, of the Chicago Alliance Against Racist and Political Repression. The CAARPR is campaigning to extend the scope of the Torture Inquiry and Relief Commission to the entire state; it is currently restricted to examine only cases within Cook County.*

printed Nov. 04, 2021

## Affidavit for Authorization

By: Valdez Lamont Jordan B29482
    LAWRENCE CORRECTIONAL CENTER
    10930 Lawrence Road
    Sumner, Illinois 62466

I, Valdez Lamont Jordan, one living breathing natural man, Affiant, having sound mind and over the age of twenty-one, voluntarily, willingly and in good faith gives the following individuals permission to act on my behalf pertaining to the following:

1. I give Ted Pearson and/or any other journalists or investigative reporters authorization to discuss my case number 99-CF-2226 People v. Valdez L. Jordan with Donna M. Polinske-Attorney At Law appointed by the court as Special Defender to my case;

2. I give Ted Pearson and/or any other journalists or investigative reporters authorization to solicit legal help on my behalf in regards to my wrongful conviction and illegal incarceration;

3. I give Ted Pearson and/or any other journalists or investigative reporters authorization to inquire, investigate, report, write, and discuss any and all matters discovered from investigating case number 99-CF-2226 and case number 19-L-1300 filed in the Third Judicial Circuit Court Madison County, Illinois, in regards to my wrongful conviction and illegal incarceration;

4. I give Ted Pearson and/or any other journalists or investigative reporters authorization to use my photographs for any purpose and matters pertaining to paragraphs 1, 2, and 3 mentioned above in this affidavit.

I, Valdez Lamont Jordan, being a real live flesh and blood breathing, Divine and Natural Being, do solemnly, and sincerely Affirm that the forgoing facts contained in this Affidavit for Authorization are true, correct, complete and certain.

Dated this 07 day of September, 2021

All Rights Reserved Without Prejudice;

I am: Valdez Lamont Jordan   *Valdez Lamont Jordan*
      Natural Person--Authorized Representative: All Rights Reserved.

Dated: September 07, 2021

*Ronald F Smith*
Witness

State of Illinois )
                 ) SS
Lawrence County  )

                              ACKNOWLEDGEMENT
SUBSCRIBED TO AND SWORN before me this 07 day of September, A.D. 2021, a Notary, that Valdez Lamont Jordan, personally appeared and known to me to be the man whose name subscribed to the within affidavit and acknowledged to be the same.

*Brandon E Yockey*   9-7-2021        Seal:
Notary Public in and for said County and State

OFFICIAL SEAL
BRANDON E YOCKEY
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 4/13/2025

Exhibit F

## STATE OF ILLINOIS -- DEPARTMENT OF CORRECTIONS
### ADJUSTMENT COMMITTEE
### FINAL SUMMARY REPORT

| | | |
|---|---|---|
| **Name:** JORDAN, VALDEZ | **IDOC Number:** B29482 | **Race:** BLK |
| **Hearing Date/Time:** 4/5/2022  02:25 PM | **Living Unit:** LAW-S-BL-10 | **Orientation Status:** N/A |
| **Incident Number:** 202200247/1 - LAW | **Status:** Final | |

| Date | Ticket # | Incident Officer | Location | Time |
|---|---|---|---|---|
| 3/27/2022 | 202200247/1-LAW | COSTANTINO, BIANCA R | HOUSING UNIT FIVE C WING | 05:00 PM |

| Offense | Violation | Final Result |
|---|---|---|
| 601.Attempt/203 | Drugs & Drug Paraphernalia<br>*Comments:synthetic cannabinoids* | Guilty |

| Witness Type | Witness ID | Witness Name | Witness Status |
|---|---|---|---|
| No Witness Requested | | | |

### RECORD OF PROCEEDINGS
Disciplinary report read.
Jordan B29482 pled not guilty and submitted a written statement.
Jordan's written statement states that he is innocent and that the individual mentioned in the report makes no mention of Jordan aiding, abetting, soliciting, conspiring, giving or receiving any synthetic cannabinoids or other drugs. Jordan states that there is no evidence or proof of him (Jordan) or someone else conspiring. Jordan stated that the 175 strips of paper all state go to change.org type in Valdez Jordan and sign petition with 4 pictures and share it. Jordan states that since 2020 he has been passing out small pieces of paper with his full name on it asking people to have their loved ones go to change.org.

### BASIS FOR DECISION
Based on disciplinary report stating that an Internal Affairs investigation was conducted on Jordan B29482. During the investigation, the Investigations Unit conducted a search for an ongoing investigation. The Investigations Unit confiscated several contraband items from the property box of an individual who will remain anonymous for the safety and security of the individual and the safety and security of Lawrence correctional Center. During the search the Investigations Unit discovered one strip of paper approximately two inches by one half inch in length. The strip of paper contained Valdez Jordan's name. After the items were confiscated, the Investigations Unit conducted a field test on the strip of paper for synthetic cannabinoids. The field test resulted in a positive result. Based on Photographs of the contraband and test were taken. On 3/5/22 the Investigations Unit conducted a search of Jordan's Property and discovered 175 pieces of the same paper that contained Jordan's name and also measured approximately two inches by one half inch in length. The Investigations Unit conducted a field test on the strips of paper for synthetic cannabinoids. The field tested resulted in a positive result. The 175 strips were confiscated, photographed and secured. Jordan B29482 identified by state ID. Based on a follow up with Internal Affairs to review the photographs of test results and contraband. Based on a DOC 0300 Shakedown slip completed.

### DISCIPLINARY ACTION  *(Consecutive to any priors)*

| RECOMMENDED | FINAL |
|---|---|
| 3 Months Segregation | 3 Months Segregation |
| 45 Days Commissary Restriction | 45 Days Commissary Restriction |
| 6 Months Contact Visits Restriction | 6 Months Contact Visits Restriction |
| **Basis for Discipline:**Seriousness of Offense | |

### Signatures
#### Hearing Committee

| | Signature | Date | Race |
|---|---|---|---|
| JOHNSON, KEVIN T  - Chair Person | | 04/05/22 | WHI |
| GILLENWATER, SHANAE B | | 04/05/22 | HSP |
| Recommended Action Approved | | | |

## STATE OF ILLINOIS -- DEPARTMENT OF CORRECTIONS
### ADJUSTMENT COMMITTEE
### FINAL SUMMARY REPORT

| | | |
|---|---|---|
| **Name:** JORDAN, VALDEZ | **IDOC Number:** B29482 | **Race:** BLK |
| **Hearing Date/Time:** 4/5/2022  02:25 PM | **Living Unit:** LAW-S-BL-10 | **Orientation Status:** N/A |
| **Incident Number:** 202200247/1 - LAW | **Status:** Final | |

**Final Comments:** N/A

---

DEANNA M BROOKHART / DMB  5/2/2022

**Chief Administrative Officer**   **Signature**   05/02/22   **Date**

The committed person has the right to appeal an adverse decision through the grievance procedure established by Department Rule 504: Subpart F.

KEVIN T JOHNSON

**Employee Serving Copy to Committed Person**   5/4/2022   10:14 AM

**When Served - - Date and Time**

504.10 Applicability, 20 IL ADC 504.10

West's Illinois Administrative Code
   Title 20. Corrections, Criminal Justice, and Law Enforcement
      Chapter I. Department of Corrections
         Subchapter E. Operations
            Part 504. Discipline and Grievances (Refs & Annos)
               Subpart A. Administration of Discipline

20 Ill. Adm. Code 504.10

504.10 Applicability

Currentness

This Subpart applies to offenders within the Department of Corrections.

**Credits**
(Source: Amended at 41 Ill. Reg. 3869, effective April 1, 2017)

Current through rules published in the Illinois Register Volume 47, Issue 6, February 10, 2023. Some sections may be more current, see credits for details.

20 ILAC § 504.10, 20 IL ADC 504.10

End of Document          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

West's Illinois Administrative Code
  Title 20. Corrections, Criminal Justice, and Law Enforcement
    Chapter I. Department of Corrections
      Subchapter E. Operations
        Part 504. Discipline and Grievances (Refs & Annos)
          Subpart A. Administration of Discipline

20 Ill. Adm. Code 504.12

504.12 Definitions

Currentness

"Chief Administrative Officer" means the highest ranking official of a correctional facility.

"Department" means the Department of Corrections.

"Director" means the Director of the Department.

"Employee", for the purpose of this Part, means any Department employee, contracted employee, employee of a vendor, or a volunteer.

"Investigative Status" means a confinement status in which an offender's movement may be restricted while an incident or matter is being investigated.

"Offender" means a person committed to the Department or to the custody of the Department.

"Seriously Mentally Ill", for the purpose of this Part, means an offender is seriously mentally ill if he or she, as a result of a mental disorder as defined in the current edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) of the American Psychiatric Association, exhibits impaired emotional, cognitive or behavioral functioning that interferes seriously with his or her ability to function adequately except with supportive treatment or services. These individuals also must either currently have, or have had within the past year, a diagnosed mental disorder, or must currently exhibit significant signs and symptoms of a mental disorder. A diagnosis of alcoholism or drug addiction, of developmental disorders, or of any form of sexual disorder shall not, by itself, render an individual seriously mentally ill. The combination of either a diagnosis or significant signs and symptoms of a mental disorder and an impaired level of functioning, as outlined in this definition, is necessary for one to be considered seriously mentally ill. Whether a person meets the criteria of seriously mentally ill is initially determined by a comprehensive, professional clinical assessment by a Department Mental Health Professional in order to determine if the individual has a diagnosable mental disorder as defined by the current DSM and to establish the person's overall level of functioning. The appropriate threshold to establish level of functioning that equates to a serious mental illness includes serious impairments in capacity to recognize reality in work, school or learning environments; frequent problems with the authority/rules; occasional combative behavior; serious impairments in relationships with friends and family; serious impairments in judgment, thinking and mood; and serious impairment due to anxiety. These disturbances must be observed in at least one of the listed areas.

"Temporary Confinement" means a confinement status in which an offender may be placed until a determination is made as to whether a disciplinary report or investigative report is to be issued, or pending a disciplinary hearing.

West's Illinois Administrative Code
  Title 20. Corrections, Criminal Justice, and Law Enforcement
    Chapter I. Department of Corrections
      Subchapter E. Operations
        Part 504. Discipline and Grievances (Refs & Annos)
          Subpart A. Administration of Discipline

20 Ill. Adm. Code 504.15

504.15. Responsibilities

Currentness

a) Unless otherwise specified, the Director or Chief Administrative Officer may delegate responsibilities stated in this Subpart to another person or persons or designate another person or persons to perform the duties specified.

b) No other individual may routinely perform duties whenever a Section in this Subpart specifically states the Director or Chief Administrative Officer shall personally perform the duties. However, the Director or Chief Administrative Officer may designate another person or persons to perform the duties during periods of his or her temporary absence or in an emergency.

**Credits**
(Source: Amended at 22 Ill. Reg. 1206, effective January 1, 1998)

Current through rules published in the Illinois Register Volume 47, Issue 6, February 10, 2023. Some sections may be more current, see credits for details.

20 ILAC § 504.15, 20 IL ADC 504.15

**End of Document**                                  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**Credits**

(Source: Amended at 41 Ill. Reg. 3869, effective April 1, 2017)

Current through rules published in the Illinois Register Volume 47, Issue 6, February 10, 2023. Some sections may be more current, see credits for details.

20 ILAC § 504.12, 20 IL ADC 504.12

   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

West's Illinois Administrative Code
  Title 20. Corrections, Criminal Justice, and Law Enforcement
    Chapter I. Department of Corrections
      Subchapter E. Operations
        Part 504. Discipline and Grievances (Refs & Annos)
          Subpart A. Administration of Discipline

20 Ill. Adm. Code 504.20

504.20 Offenses and Maximum Penalties

Currentness

Disciplinary offenses are defined in Appendix A. Maximum penalties for conduct that constitutes a disciplinary offense are set forth in Table A.

a) No offender shall be found guilty of any violation of this Part without a hearing before the Adjustment Committee or Program Unit. If an offender is transferred from one facility to another while pending a hearing, the individual shall be provided with an opportunity to present a defense at any subsequent disciplinary hearing held at the receiving facility that is comparable to that which would have been afforded, in accordance with this Subpart, at the sending facility.

b) In determining the appropriate sanctions, the Adjustment Committee or Program Unit, the Chief Administrative Officer and the Director shall consider, among other matters, mitigating or aggravating factors including:

  1) The offender's age, medical and mental state at the time of committing the offense;

  2) If the offender is determined to be seriously mentally ill and if the sanctions for the violation may include a period of segregation, the recommendations of a mental health professional;

  3) The extent and degree of participation in the commission of the offense;

  4) The amount or nature of stolen property, contraband or injury; and

  5) The offender's prior disciplinary record.

c) Corporal punishment, disciplinary restrictions on diet, medical or sanitary facilities, clothing, bedding, mail or access to legal materials and reductions in the frequency of use of toilets, washbowls and showers shall be prohibited.

d) Disciplinary restrictions on visitation, work, education or program assignments and use of the library shall be related as closely as practicable to the abuse of these privileges. This subsection shall not apply to segregation of offenders for purposes of institutional control.

e) Offenders are presumed to be responsible for any contraband or other property prohibited by this Part that is located on their person, within their cell or within areas of their housing, work, educational or vocational assignment that are under their control. Areas under an offender's control include, but are not limited to, the door-track, window ledge, ventilation unit, plumbing, and the offender's desk, cabinet, shelving, storage area, bed and bedding materials in his or her housing assignment, and desk, cubicle, work station and locker in his or her work, educational or vocational assignment. If the offender produces evidence that convinces the Adjustment Committee or Program Unit that he or she did not commit the offense, the offender shall be found not guilty.

**Credits**

(Source: Amended at 41 Ill. Reg. 3869, effective April 1, 2017)

Current through rules published in the Illinois Register Volume 47, Issue 6, February 10, 2023. Some sections may be more current, see credits for details.

20 ILAC § 504.20, 20 IL ADC 504.20

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

West's Illinois Administrative Code
  Title 20. Corrections, Criminal Justice, and Law Enforcement
    Chapter I. Department of Corrections
      Subchapter E. Operations
        Part 504. Discipline and Grievances (Refs & Annos)
          Subpart A. Administration of Discipline

20 Ill. Adm. Code 504.30

504.30 Preparation of Disciplinary Reports

Currentness

a) Every employee has the duty to observe the conduct of offenders.

b) If an employee observes an offender committing an offense, discovers evidence of its commission or receives information from a reliable witness of the conduct, the employee shall promptly prepare a disciplinary report. However, if the infraction is listed in the 400 series in Table A and the employee determines a disciplinary report is not necessary to resolve the situation, the employee may orally reprimand the offender.

c) The disciplinary report must be fully completed. The reporting employee shall provide the following information to the extent known or available:

    1) The name and identification number of the offender.

    2) The place, time and date of the offense.

    3) The offense that the offender is alleged to have committed.

    4) A written statement detailing the conduct observed.

    5) The names of offenders, employees and visitors who were witnesses. The identity of witnesses may be withheld for reasons of security provided a statement to that effect and the information the confidential source provided are included on the disciplinary report to the extent the information can be included without jeopardizing security.

    6) The signature of the reporting employee and the date and time the report is completed.

d) If an offender is suspected of committing a disciplinary offense, an investigative disciplinary report, hereinafter referred to as an investigative report, shall be issued that reasonably informs the offender of the subject of the investigation to the extent that safety and security allow. In no event shall an investigative report be served upon an offender more than eight calendar

days after the suspected commission of an offense or the discovery of an offense, whichever is later, unless the offender is unavailable or unable to participate in the proceeding.

e) Service of a disciplinary report upon the offender shall commence the disciplinary proceeding. In no event shall a disciplinary report be served upon an offender more than eight calendar days after the commission of an offense or the discovery of an offense unless the offender is unavailable or unable to participate in the proceeding.

**Credits**

(Source: Amended at 41 Ill. Reg. 3869, effective April 1, 2017)

Current through rules published in the Illinois Register Volume 47, Issue 6, February 10, 2023. Some sections may be more current, see credits for details.

20 ILAC § 504.30, 20 IL ADC 504.30

**End of Document**                                                © 2023 Thomson Reuters. No claim to original U.S. Government Works.

West's Illinois Administrative Code
  Title 20. Corrections, Criminal Justice, and Law Enforcement
    Chapter I. Department of Corrections
      Subchapter E. Operations
        Part 504. Discipline and Grievances (Refs & Annos)
          Subpart A. Administration of Discipline

20 Ill. Adm. Code 504.40

504.40 Investigative Status and Temporary Confinement

Currentness

The shift supervisor shall determine whether or not it is necessary to place the offender in investigative status or in temporary confinement status pending a disciplinary hearing or a determination whether to issue a disciplinary or investigative report in accordance with Section 504.30. If the offender has been diagnosed as seriously mentally ill, the shift supervisor shall ensure a mental health professional completes a documented review of the offender within 48 hours and provides his or her recommendation for temporary confinement to the Chief Administrative Officer. The Chief Administrative Officer shall also have the authority to release the offender from temporary confinement. The decision to place an offender in investigative status or temporary confinement may be based, among other matters, on:

a) The aggressiveness of the offender;

b) The threat posed to the safety and security of the facility or any person;

c) The need to restrict the offender's access to general population to protect the individual from injury or to conduct the investigation;

d) The seriousness of the offense; or

e) Contraindication for placement determined by a mental health professional.

**Credits**
(Source: Amended at 41 Ill. Reg. 3869, effective April 1, 2017)

Current through rules published in the Illinois Register Volume 47, Issue 6, February 10, 2023. Some sections may be more current, see credits for details.

20 ILAC § 504.40, 20 IL ADC 504.40

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

West's Illinois Administrative Code
   Title 20. Corrections, Criminal Justice, and Law Enforcement
      Chapter I. Department of Corrections
         Subchapter E. Operations
            Part 504. Discipline and Grievances (Refs & Annos)
               Subpart A. Administration of Discipline

20 Ill. Adm. Code 504.50

504.50 Review of Disciplinary Reports

Currentness

a) The Chief Administrative Officer of each facility shall designate one or more Reviewing Officers.

b) The Reviewing Officer shall review the decision to place an offender in temporary confinement within three calendar days after the placement, whenever possible, and may order release from or placement in temporary confinement. Among other matters, the factors listed in Section 504.40 may be considered. If a disciplinary or investigative report has not been written within three calendar days after placement in temporary confinement, the Reviewing Officer shall inform the Chief Administrative Officer.

c) An offender who receives an investigative report shall be interviewed by the Reviewing Officer in order to permit the offender an opportunity to present his or her views regarding placement in investigative status. The interview shall be conducted within 10 calendar days after initial placement in investigative status, whenever possible.

   1) The Reviewing Officer shall recommend whether to continue placement of the offender in investigative status. Among other matters, factors listed in Section 504.40 may be considered. The Chief Administrative Officer shall make the final determination.

   2) The offender shall be informed of the decision and the decision shall be documented in writing.

   3) The offender may be detained in investigative status for up to 30 days.

   4) If the investigation does not indicate that the offender may be guilty of any disciplinary offense, placement in investigative status shall be terminated and the report shall be expunged from the offender's records. A copy shall be maintained in an expungement file. This decision shall be made by the Chief Administrative Officer and shall be documented in writing.

   5) If, as a result of the investigation, it is necessary to amend or modify the original charges, the offender shall be issued a revised disciplinary report.

Current through rules published in the Illinois Register Volume 47, Issue 6, February 10, 2023. Some sections may be more current, see credits for details.

20 ILAC § 504.60, 20 IL ADC 504.60

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

West's Illinois Administrative Code
   Title 20. Corrections, Criminal Justice, and Law Enforcement
      Chapter I. Department of Corrections
         Subchapter E. Operations
            Part 504. Discipline and Grievances (Refs & Annos)
               Subpart A. Administration of Discipline

20 Ill. Adm. Code 504.60

504.60 Investigation of Major Disciplinary Reports

Currentness

a) The Chief Administrative Officer shall appoint one or more Hearing Investigators who shall review all major disciplinary reports.

1) The Hearing Investigator may conduct an investigation into the charges as determined to be appropriate. This determination may be based, among other matters, upon the severity of the offense, the complexity of the charges or the offender's admission of guilt. The investigation may include an investigation of additional charges.

2) The Hearing Investigator may correct or direct the reporting employee to correct any errors in the disciplinary report. The offender shall be provided with a copy of the corrected report. In the event the corrected report contains new charges, the offender shall be provided a copy of the corrected report at least 24 hours prior to the hearing unless the offender waives this notice.

3) The Hearing Investigator may interview any person who may have information that relates to the alleged violation and may inspect any physical evidence.

4) The Hearing Investigator shall determine whether to submit a report to the Adjustment Committee, based upon the results of the investigation. However, if the investigation reveals evidence of a convincing nature that the offender did not commit the offense, that evidence must be reported to the Adjustment Committee.

5) Any report may be submitted in writing or presented orally, as determined by the Hearing Investigator.

b) If the offender has been diagnosed as seriously mentally ill and the sanction for the offense may result in a period of segregation, a mental health professional shall be assigned to review the offender's mental health records and disciplinary report to determine if the offender's mental illness contributed to the underlying behavior of the offense.

**Credits**
(Source: Amended at 41 Ill. Reg. 3869, effective April 1, 2017)

West's Illinois Administrative Code
  Title 20. Corrections, Criminal Justice, and Law Enforcement
    Chapter I. Department of Corrections
      Subchapter E. Operations
        Part 504. Discipline and Grievances (Refs & Annos)
          Subpart A. Administration of Discipline

20 Ill. Adm. Code 504.70

504.70 Adjustment Committee and Program Unit Composition

Currentness

a) The Chief Administrative Officer shall appoint the Adjustment Committee, which shall be composed of at least two members.

  1) The Adjustment Committee shall include:

    A) To the extent possible, a person representing the counseling staff; and

    B) At least one minority staff member.

  2) The Chief Administrative Officer shall designate a chairperson.

b) The Program Unit shall be composed of a group of employees appointed by the Chief Administrative Officer who shall serve as Hearing Officers. At least one member of the Program Unit shall be a minority staff member.

**Credits**
(Source: Amended at 41 Ill. Reg. 3869, effective April 1, 2017)

Current through rules published in the Illinois Register Volume 47, Issue 6, February 10, 2023. Some sections may be more current, see credits for details.

20 ILAC § 504.70, 20 IL ADC 504.70

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

West's Illinois Administrative Code
  Title 20. Corrections, Criminal Justice, and Law Enforcement
    Chapter I. Department of Corrections
      Subchapter E. Operations
        Part 504. Discipline and Grievances (Refs & Annos)
          Subpart A. Administration of Discipline

20 Ill. Adm. Code 504.80

504.80 Adjustment Committee Hearing Procedures

Currentness

a) The Adjustment Committee hearing shall be convened, but need not be concluded, within 14 days after the commission of the offense by an offender or its discovery, whenever possible, unless the offender has received a continuance or is unable or unavailable for any reason to participate in the hearing. For purposes of this Section, when an investigation has taken place, an offense is considered to be discovered upon the conclusion of the investigation. Inability to participate includes the absence of the offender from the facility for any reason or certification by health care or mental health staff that the offender is unable to appear.

b) The offender shall receive written notice of the facts and charges being presented against him or her no less than 24 hours prior to the Adjustment Committee hearing. The offender may waive the 24-hour advance notice. The waiver shall be in writing.

c) The offender shall be informed before or at the hearing of information that would tend to show that the offender was not guilty. If the information is provided to him or her at the hearing, the offender, upon request, shall be given a continuance.

d) Any person who initiated the allegations that serve as the basis for the disciplinary report, or who conducted an investigation into those allegations, or who witnessed the incident, or who is otherwise not impartial shall not serve on the Adjustment Committee hearing that disciplinary report. An offender who objects to a member of the Adjustment Committee based on a lack of impartiality must raise the matter at the beginning of the hearing. The Adjustment Committee shall document the basis of the objection and the decision in the Adjustment Committee summary.

e) An offender may, upon written request and for good cause shown, be granted additional time to prepare his or her defense. If, at the time of the hearing, the Adjustment Committee determines that the offender was unable to prepare a defense because of a language barrier or hearing impairment, the Adjustment Committee shall automatically grant a request for a continuance for language assistance. The committee shall then make the necessary arrangements for language assistance. Inability to prepare a defense due to a language barrier includes, but is not limited to, a request for witnesses.

f) Any offender charged with a violation of any rule shall have the right to appear before and address the Adjustment Committee. Any refusal to appear shall be documented and provided to the Adjustment Committee. However, failure to appear before or address the Adjustment Committee may be adversely construed against the individual by the Adjustment Committee.

  1) The offender may make any relevant statement or produce any relevant documents in his or her defense.

2) Prior to the hearing, the offender may request that witnesses be interviewed. The request shall be in writing on the space provided in the disciplinary report and shall include an explanation of what the witnesses would state. If the offender fails to make the request in a timely manner before the hearing, the individual may be granted a continuance for good cause shown.

g) The Adjustment Committee shall consider all material presented that is relevant to the issue of whether the offender committed the offense.

h) If the offender has been diagnosed as seriously mentally ill, the Adjustment Committee may request the reviewing mental health professional to appear before the Adjustment Committee to provide testimony relevant to his or her review.

i) The Adjustment Committee shall consider any statements of witnesses with relevant knowledge of the incident who are reasonably available.

1) The Adjustment Committee or its Hearing Investigator may interview witnesses and prepare or review summaries of their testimony prior to or at or subsequent to the hearing.

2) The offender does not have the right to confront or cross-examine any witnesses, but may submit questions for witnesses to the Adjustment Committee prior to the hearing. These questions shall be asked by the Adjustment Committee or its Hearing Investigator unless found to be cumulative, irrelevant or a threat to the safety of individuals or the security of the facility.

3) A means shall be provided in each living unit for offenders to submit witness request slips. The Adjustment Committee may disapprove witness requests that are not received prior to the hearing.

4) Requests by offenders for witnesses may be denied if their testimony would be, among other matters, irrelevant or cumulative or would jeopardize the safety or disrupt the security of the facility. If any witness request is denied, a written reason shall be provided.

5) At least one person who serves as an Adjustment Committee member shall hear the in-person testimony of the offender's witnesses when the offender makes a timely request for the witnesses or is granted a continuance to request witness testimony. In-person testimony of the offender's witnesses shall be defined as face-to-face contact or telephonic contact by the Adjustment Committee.

6) If the Adjustment Committee makes a written determination that the in-person testimony by the witness requested by the offender would undermine authority or would present potential disruption of the operations of the facility or a threat to the safety of any person or institutional safety or correctional goals, the Adjustment Committee may elect to accept the testimony through other legally permissible means, including, but not limited to, a sworn written summary of an interview of the witness or a sworn statement.

7) A sworn written statement or sworn written summary of a witness' testimony is a reasonable alternative to in-person testimony if the witness' testimony will be accepted as credible and it involves verification of alleged facts, including, but not limited to, a witness who will testify to the authenticity of contents of a record or document, cell location, work assignment, writ status, staff work schedule or identification.

8) When testimony is presented to the Adjustment Committee in the form of a written summary or statement, a copy of the written summary or statement shall be given to the accused offender unless the Adjustment Committee finds that disclosure presents a threat to the safety of any person.

j) The offender shall not have the right to either retained or appointed counsel. The offender may request the assistance of a staff member in the preparation and presentation of his or her defense if he or she is illiterate, has a hearing impairment or does not speak English; or when other circumstances exist that preclude the individual from adequately preparing his or her defense.

k) The Adjustment Committee shall decide whether the offender committed the offense based upon all relevant information and evidence.

1) The Adjustment Committee must be reasonably satisfied there is some evidence that the offender committed the offense for the individual to be found guilty.

2) The Adjustment Committee may require that any part of the hearing process be recorded, including, but not limited to, a self admission of guilt by the offender.

3) Polygraph or voice stress analysis results may be considered, but may not be the sole basis for finding the offender guilty of the offense.

l) The Adjustment Committee shall take one of the following actions, based upon the evidence admitted:

1) Find that the offender did not commit the offense. In that case, the Adjustment Committee shall order that the disciplinary report be dismissed and expunged from the offender's record. A copy shall be maintained in an expungement file.

2) Find that further investigation is necessary to determine if the offender did or did not commit the offense and place the offender in investigative status.

3) Find that additional time is needed to obtain information relative to the charge. The hearing may be continued for a reasonable time. However, unless the offender is placed in investigative status, the individual may not be confined for more than 14 days from the date of placement in temporary confinement.

4) Find that the offender did commit the offense or a lesser offense for which the elements were included in the original charge. The Adjustment Committee may recommend one or more of the following disciplinary actions:

A) Reprimand the offender.

B) Suspend or restrict one or more privileges of the offender for a specific period of time.

C) Reduce the offender's grade or level.

D) Change the offender's program.

E) Change the offender's housing assignment or transfer the individual to another correctional facility.

F) Revoke the offender's statutory sentence credit or recommend an adjustment of provisionally awarded supplemental sentence credit.

G) Increase the offender's security classification.

H) Place the offender in segregation or confinement. If the offender has been diagnosed as seriously mentally ill, the Adjustment Committee shall consider the recommendation of the reviewing mental health professional for the term of segregation, including no period of segregation.

I) Require the offender to make restitution.

J) Revoke the offender from a transition center. If revocation is recommended, the Adjustment Committee may also recommend reduction in grade and placement in segregation.

K) Require forfeiture of items of contraband used in the offense or possessed in violation of this Part.

5) This Part shall in no way be construed to restrict or limit the Department's ability to administratively change an offender's job, educational, program or housing assignment, to restrict privileges or to transfer the offender to another facility.

m) A written record shall be prepared and signed by all members of the Adjustment Committee that contains:

l) A summary of oral and written statements and other evidence presented.

A) The Adjustment Committee may consider information from confidential sources if:

i) It finds that his or her identity must be withheld for reasons of security; and

ii) The information is reliable.

B) Reliability may be established by one of the following:

i) The investigating officer has indicated, in writing and by his or her appearance before the Adjustment Committee, the truth of his or her report containing confidential information;

ii) Corroborating testimony such as statements from other sources or polygraph or voice stress analysis results; or

iii) A statement by a member of the Adjustment Committee or an oral or written statement to the Adjustment Committee by supervisory or administrative staff that the individual has firsthand knowledge of the sources of information and considers them reliable on the basis of their past record of reliability.

C) If the identity of a source is being withheld for reasons of security, a statement to that effect and a statement that the Adjustment Committee finds the information reliable must be included. A summary of the information provided and the basis for the finding of reliability shall be documented, but need not be included in the summary based on safety and security concerns.

2) If the Adjustment Committee members find that the offender committed the offense, a statement as to their reasons for the finding. If exonerating evidence is presented and disregarded, the Adjustment Committee must state the basis for disregarding the evidence.

3) The disposition of the charges, the disciplinary action recommended and the reasons for recommending the disciplinary action.

n) If the safety or security of the facility or any person is jeopardized by certain references in the written record, they may be deleted but the fact that omissions have been made shall be noted on the summary, along with a finding that material is being deleted based on safety or security concerns.

o) If the offender is found guilty, the individual shall be informed of the opportunity to appeal through the grievance procedures in 20 Ill. Adm. Code 504.Subpart F.

p) A copy of the disciplinary report, Adjustment Committee summary, and, if applicable, the mental health review shall be forwarded to the Chief Administrative Officer for review and approval, and a copy shall be filed in the offender's record. The offender shall be given a copy of the Adjustment Committee summary.

q) The Chief Administrative Officer shall review all Adjustment Committee dispositions. The Director shall review all Adjustment Committee dispositions in which it is recommended that the offender lose statutory sentence credit or provisionally awarded supplemental sentence credit.

1) The Director, Deputy Director or Chief Administrative Officer may take the following actions:

 A) Confirm the recommendation in whole or in part.

 B) Order additional or new proceedings.

 C) Suspend or overturn the recommendation.

 D) Offer the offender a work assignment that, if accepted and satisfactorily completed, will result in reduction of original disciplinary sanctions.

2) The Director, Deputy Director or Chief Administrative Officer shall not increase the sanctions recommended by the Adjustment Committee, but he or she may reduce them. The offender shall be sent a copy of any modification to the Adjustment Committee recommendations.

**Credits**

(Source: Amended at 41 Ill. Reg. 3869, effective April 1, 2017)

Current through rules published in the Illinois Register Volume 47, Issue 6, February 10, 2023. Some sections may be more current, see credits for details.

20 ILAC § 504.80, 20 IL ADC 504.80

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

West's Illinois Administrative Code
   Title 20. Corrections, Criminal Justice, and Law Enforcement
      Chapter I. Department of Corrections
         Subchapter E. Operations
            Part 504. Discipline and Grievances (Refs & Annos)
               Subpart A. Administration of Discipline

20 Ill. Adm. Code 504.90

504.90 New or Additional Proceedings

Currentness

a) The Director, Deputy Director or Chief Administrative Officer shall remand the decision to the Adjustment Committee for new proceedings if the proceedings are found to be defective due to:

   1) Inadequate notice, including failure to state the correct date of the offense on the disciplinary report or failure to provide the offender with 24-hour notice of the hearing, unless notice was waived.

   2) Lack of impartiality of the Adjustment Committee.

   3) Improper exclusion of witnesses.

   4) Failure to provide exonerating information to the offender prior to the hearing.

b) New or additional proceedings may be ordered in other circumstances, as determined by the Director, Deputy Director or Chief Administrative Officer.

   1) The offender shall be provided with notice of the rehearing within a reasonable time after the Chief Administrative Officer's decision or the facility's receipt of the decision.

   2) The rehearing shall commence within 14 calendar days after the Chief Administrative Officer's decision or the facility's receipt of the decision, whenever possible.

   3) The procedures on remand shall be conducted in accordance with the procedures governing the hearing on the original charge.

c) The Director, Deputy Director or Chief Administrative Officer may remand the decision to the Adjustment Committee for additional documentation, correction or clarification of the Adjustment Committee summary, including the statement of reasons for excluding witnesses, the basis for the finding of guilt and imposition of sanctions, statement of reasons for deeming sources to be confidential, or the failure to specify reasons for finding a confidential source to be reliable.

1) The offender shall not have the right to a new hearing, but shall be notified of the decision.

2) After the Adjustment Committee has amended its summary, it shall be forwarded to the Chief Administrative Officer and then to the Director in accordance with the procedures applicable to review of the original disposition.

d) Upon remand, sanctions greater than those imposed at the original hearing shall not be permitted unless the offender is charged with a different offense that provides for a greater penalty than provided for under the original charge or new evidence is produced that was not available at the original hearing and justifies the imposition of greater punishment. However, this does not prohibit the offender from being found guilty and disciplined on remand when the Adjustment Committee had erroneously dismissed the disciplinary report on procedural grounds.

**Credits**
(Source: Amended at 41 Ill. Reg. 3869, effective April 1, 2017)

Current through rules published in the Illinois Register Volume 47, Issue 6, February 10, 2023. Some sections may be more current, see credits for details.

20 ILAC § 504.90, 20 IL ADC 504.90

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

West's Illinois Administrative Code
  Title 20. Corrections, Criminal Justice, and Law Enforcement
    Chapter I. Department of Corrections
      Subchapter E. Operations
        Part 504. Discipline and Grievances (Refs & Annos)
          Subpart A. Administration of Discipline

20 Ill. Adm. Code 504.100

504.100 Program Unit Hearing Procedures

Currentness

a) The Program Unit hearing shall be convened, but need not be concluded, within 14 calendar days after the commission of the offense or its discovery, whenever possible, unless the offender is unable to participate in the hearing.

b) The offender shall receive written notice of the facts and charges being presented against him or her prior to the hearing.

c) Any person who initiated the allegations that serve as the basis for the disciplinary report, or who conducted a formal investigation into those allegations, or who witnessed the incident, or who is otherwise not impartial, shall not conduct a hearing on that report.

d) The hearing may be continued to obtain additional information or upon the offender's written request and for good cause shown.

e) The offender shall have the right to appear before and address the Program Unit Hearing Officer.

f) The Program Unit Hearing Officer may call witnesses and review any information relevant to the charge.

g) The offender shall not have the right to retained or appointed counsel. The offender may request the assistance of a staff member in the preparation of his or her defense if the individual is illiterate, has a hearing impairment or does not speak English, or when other circumstances exist that preclude the individual from adequately preparing his or her defense.

h) The Program Unit Hearing Officer may return a disciplinary report to the Chief Administrative Officer with a recommendation for a hearing before the Adjustment Committee. The factors listed in Section 504.20(b) shall be considered when making this determination.

  1) If approved by the Chief Administrative Officer, a hearing before the Adjustment Committee shall commence within 14 calendar days after the approval, whenever possible.

2) If not approved, the disciplinary report shall be referred back for a hearing before the Program Unit that shall commence within 14 calendar days after the decision not to approve the recommendation, whenever possible.

i) The Program Unit Hearing Officer may recommend any of the actions authorized in Section 504.80(l), except that the Officer may not recommend placement in segregation or confinement, revocation of sentence credit, revocation of transition center status, an increase in the offender's security classification, or transfer to another correctional facility.

j) A record shall be signed by the Hearing Officer that contains a summary of oral and written statements and other evidence presented, the decision and the disciplinary action recommended.

k) The summary shall be processed in accordance with Sections 504.80(p) and (q) and 504.90.

**Credits**
(Source: Amended at 41 Ill. Reg. 3869, effective April 1, 2017)

Current through rules published in the Illinois Register Volume 47, Issue 6, February 10, 2023. Some sections may be more current, see credits for details.

20 ILAC § 504.100, 20 IL ADC 504.100

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works